David **BLEDSOE, et al., Plaintiffs,**

v.

**EMERY WORLDWIDE AIRLINES, et al., Defendants.**

No. C–3–02–069.

United States District Court, S.D. Ohio, Western Division.

March 17, 2003.

David Gerard Torchia, Tobias & Kraus, Cincinnati, OH, for plaintiffs.

Michelle R. Arendt, Ulmer and Berne, Cleveland, OH, Jacqueline Schuster Hobbs, Ulmer & Berne, Cincinnati, OH, Thomas H. Barnard, Jr., Ulmer & Berne, LLP, Columbus, OH, for defendants.

DECISION AND ENTRY OVERRULING DEFENDANT CNF'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED (DOC. # 11); DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' DEMAND FOR A JURY TRIAL (DOC. # 28); DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (DOC. # 20); CONFERENCE CALL SET

RICE, Chief Judge.

Plaintiffs have filed a Class Action Complaint, seeking to represent, as stated in their Second Amended Class Action Complaint, "all persons who were employed by Defendant [Emery Worldwide Airlines] as of August 11, 2001; were notified of a layoff between August 11 and 15, 2001; were permanently laid off as of December 5, 2001; and who did not receive [60 days'] notice or pay in lieu thereof for the mass layoff that occurred in August of 2001 or plant closing that took place in December of 2001." (Second Amended Complaint ¶ 16.) The action is brought under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, *et seq.* ("WARN Act"). The named Plaintiffs are David Bledsoe, Gary Plaster, Rick Bridges, David Ungemech and Steven E. Dolski (collectively, "Plaintiffs"). The Defendants are Emery Worldwide Airlines ("Emery") and its parent company, CNF, Inc. ("CNF") (collectively, "Defendants").

Several Motions are at issue. CNF alone has filed a Motion to Dismiss for Lack of Personal Jurisdiction and for Failure to State a Claim Upon Which Relief May be Granted (Doc. # 11), the Plaintiffs

have filed a Motion for Class Certification (Doc. # 20), and the Defendants have together filed a Motion to Strike Plaintiffs' Demand for a Jury Trial (Doc. # 28).

The Court will first discuss the facts of this case and the controlling provisions of the WARN Act, and then will rule on each of the motions.

## I. Factual Background and Pertinent Provisions of the WARN Act

For purposes of ruling on the several motions at issue, the Court will assume the facts as stated in the Second Amended Complaint, unless otherwise stated.

The Plaintiffs are former employees of Emery, all of whom worked in Vandalia, Ohio, and were laid off, without prior notice, between August 11 and 15, 2001.[1] The proposed class would number about 800 individuals. Emery, a commercial air freight carrier, was the Plaintiffs' direct employer, but the decision to lay them off was made by Emery's parent, CNF. The stated reason for the layoff was that the Federal Aviation Administration ("FAA") unexpectedly informed Emery on August 11, 2001, that it (Emery) would have to cease its flight operations or have its operating certificate suspended. On August 15 and 24, Emery informed the Plaintiffs in writing that the layoffs were expected to be temporary, and that they would be recalled when the FAA matter was resolved. On or about November 5, 2001, Emery informed the Plaintiffs in writing that their layoff period would continue until at least April, 2002. On or about December 5, 2001, Emery announced to the Plaintiffs that CNF had determined that its (Emery's) commercial air carrier operations would not be resumed, and that the layoffs would become permanent.

The Plaintiff's allege that Emery and CNF failed to provide them with adequate notice of both their initial layoffs and their permanent terminations. The relevant WARN Act provision is codified at 29 U.S.C. § 2102, and states:

> § 2102. *Notice required before plant closings and mass layoffs*
>
> (a) Notice to employees, State dislocated worker units, and local governments An employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order—
>
> **(1)** to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee; and
>
> **(2)** to the State or entity designated by the State to carry out rapid response activities under section 2864(a)(2)(A) of this title, and the chief elected official of the unit of local government within which such closing or layoff is to occur.
>
> If there is more than one such unit, the unit of local government which the employer shall notify is the unit of local government to which the employer pays the highest taxes for the year preceding the year for which the determination is made.
>
> (b) Reduction of notification period
>
> **(1)** An employer may order the shutdown of a single site of employment before the conclusion of the 60–day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably

---

**1.** The Plaintiffs have subsequently stated that their class should include others who were not employed in Vandalia and who were laid off after August 15, 2001. (*See* Reply Memo. In Support of Class Certif. (Doc. # 27) at 1–2.) The Court will address that matter when it considers their Motion for Class Certification.

and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

(2)(A) An employer may order a plant closing or mass layoff before the conclusion of the 60–day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.

(B) No notice under this chapter shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States.

(3) An employer relying on this subsection shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period.

(c) Extension of layoff period

A layoff of more than 6 months which, at its outset, was announced to be a layoff of 6 months or less, shall be treated as an employment loss under this chapter unless—

(1) the extension beyond 6 months is caused by business circumstances (including unforeseeable changes in price or cost) not reasonably foreseeable at the time of the initial layoff; and

(2) notice is given at the time it becomes reasonably foreseeable that the extension beyond 6 months will be required.

(d) Determinations with respect to employment loss

For purposes of this section, in determining whether a plant closing or mass layoff has occurred or will occur, employment losses for 2 or more groups at a single site of employment, each of which is less than the minimum number of employees specified in section 2101(a)(2) or (3) of this title but which in the aggregate exceed that minimum number, and which occur within any 90–day period shall be considered to be a plant closing or mass layoff unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of this chapter.

"Employer" is defined as any business enterprise that employs 100 or more employees, excluding part-time employees, or 100 or more employees who in the aggregate work at least 4000 hours per week (exclusive of overtime). *Id.* § 2101(a)(1). A "plant closing" is defined as the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30–day period for 50 or more full-time employees. *Id.* 2101(a)(2). A "mass layoff" is defined as a reduction in force which is not the result of a plant closing, and which results in an employment loss at a single site of employment during any 30–day period for at least 33 percent of full-time employees, provided it affects at least 50 such employees, or for at least 500 full-time employees. *Id.* § 2101(a)(3). An "employment loss" is defined as a termination other than for cause, voluntary departure or retirement, or a layoff exceeding six months, or a reduction in work of more than 50 percent during each month of any six-month period. *Id.* § 2101(a)(6).

The Plaintiffs' claim is that, *first*, they were due, and did not receive, 60–day notifications of their initial layoffs, which they argue constituted a mass layoff, and, *second*, that they were due, and did not receive, 60–day notifications of their subsequent terminations, which they argue constituted a plant closing. The common questions of law and fact which they ar-

gue support their class certification are: (1) whether Defendants failed to provide the requisite notice for the mass layoff between August 11 and 15, 2001; (2) whether Defendants failed to provide the requisite notice for the plant closing on December 5, 2001; and (3) whether Defendants are required to provide 60 days' pay and benefits to all class members as a result of their alleged violations of the WARN Act. (Second Amended Complaint ¶ 19.)

## II. *CNF's Motion to Dismiss for Lack of Personal Jurisdiction and for Failure to State a Claim (Doc. # 11)*

Because CNF's Motion incorporates two distinct arguments for dismissal, the Court will consider them in turn, beginning with the first, for dismissal for lack of personal jurisdiction.

### A. *Dismissal for Lack of Personal Jurisdiction*

Rule 12(b)(2) of the Federal Rules of Civil Procedure requires dismissal of a defendant if the Court lacks jurisdiction over its person. Once personal jurisdiction over a defendant has been challenged, it is the Plaintiff's burden to show, by affidavit or other competent evidence, that jurisdiction does exist; he may not rest on the facts as stated in the pleadings. *See Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir.1991). Whether personal jurisdiction exists turns on the law of the forum state, subject to due process concerns under the Fourteenth Amendment. *See CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1262 (6th Cir.1996). Thus, the Court must determine whether CNF is subject to Ohio's long-arm statute, and whether the Court's exercise of jurisdiction over it would not offend due process concerns. *See id.* at 1262–63.

Relevant to this discussion, Ohio's long-arm statute states that non-residents may be subject to jurisdiction if, among other things, they transact any business in this state, cause tortious injury by an act or omission in this state, or cause tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when they might reasonably have expected that some person would be injured thereby in this state. *See* Ohio Rev.Code § 2307.382(1), (3) & (6). If the Court finds that CNF comes within the long-arm statute by virtue of one of these conditions, it still must ask whether CNF has sufficient contacts with Ohio, such that the Court's exercise of jurisdiction would comport with traditional notions of fair play and substantial justice. *See id.* at 1263.

CNF argues that it is a corporate entity separate and distinct from Emery, its subsidiary, and that it cannot be sued in this Court because it was not responsible for the facts giving rise to the Plaintiffs' allegations and because the Court lacks personal jurisdiction over it. In support of its argument, it submits the affidavit of Mark C. Thickpenny, its Vice President and Treasurer (attached to Doc. # 11). According to Thickpenny, CNF is a holding company of global supply-chain services, including businesses providing an array of transportation services. (Thickpenny Aff. ¶ 2.) It is incorporated in Delaware but maintains its principal place of business in Palo Alto, California. (*Id.* ¶ 3.) Emery is one of more than twenty subsidiaries and maintains its own, separate and distinct administration, accounting and personnel departments. (*Id.*) CNF does not and never has owned property in Ohio, maintained offices or operations in Ohio, entered into contracts in Ohio, conducted business in Ohio or been licensed to do business in Ohio. (*Id.* ¶ 4.) Emery is a wholly owned subsidiary of CNF, which existed as a corporate entity prior to its acquisition by CNF in 1989, and which

continued to maintain its own board of directors and conduct all of its own corporate business and human relations, etc., after its acquisition. (*Id.* ¶¶ 5–9.) One CNF board member also sits on the board of Emery and five CNF officers serve as officers of Emery, though none is involved in Emery's day-to-day management or operations. (*Id.* ¶ 10 & Ex. A.) Thickpenny also states that Emery alone resolved to terminate its operations in Vandalia on November 29, 2001. (*Id.* ¶ 11.) Emery's resolution was approved by CNF on December 4, 2001. (*Id.* ¶ 12.) Finally, he states that all decisions affecting the termination of the Plaintiffs were made by Emery. (*Id.* ¶ 13.)

■ Because of the above-stated facts, CNF argues that it is not subject to personal jurisdiction in this Court. Its argument flows from the axiomatic proposition that "mere ownership of a subsidiary does not justify the imposition of liability on the parent ..., [n]or will liability be imposed on the parent corporation merely because directors of the parent corporation also serve as directors of the subsidiary." *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 484 (3rd Cir.2001) (citing *United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998)), *cert. denied,* 534 U.S. 950, 122 S.Ct. 345, 151 L.Ed.2d 261 (2001); *American Bell Inc. v. Federation of Tel. Workers of Pa.,* 736 F.2d 879, 887 (3rd Cir.1984).

■ Recognizing this, the Plaintiffs do not allege that they worked directly for CNF, but that CNF became its de facto employer by making the employment decisions for Emery which affected their employment. They cite to other federal court decisions which support the proposition that corporate parents may be regarded as employers for purposes of the WARN Act if the affected employees can adduce evidence that the corporate parent made the corporate decisions for their actual employer which affected them. *See International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers, General Truck Drivers, Office Food & Warehouse Local 952 v. American Delivery Service Co., Inc.,* 50 F.3d 770 (9th Cir.1995); *Local 397, Int'l Union of Electronic, Elec. Salaried Mach. and Furniture Workers, AFL–CIO v. Midwest Fasteners, Inc.,* 779 F.Supp. 788 (D.N.J.1992); *Oil, Chemical and Atomic Workers Int'l Union, Local 7–515, AFL–CIO v. American Home Prods. Corp.,* 1991 WL 342379 (N.D.Ind.1991). However, as CNF points out in its Reply Memorandum (Doc. # 24), the Plaintiffs have not adduced any evidence supporting their allegations that CNF directed the operations of Emery which led to the decision to lay them off and later terminate them on a permanent basis. CNF does not cite to decisions of federal courts reaching opposite conclusions, but it does make a strong point that the Plaintiffs have not met the evidentiary burden which the plaintiffs in the above-cited cases had met, demonstrating that the corporate parent and the subsidiary operated more or less as a single employer.[2]

The truth of the matter is crucial. If CNF was calling the shots at Emery, then

**2.** As noted by the Third Circuit in *Pearson, supra,* various tests have developed in various fields of the law for evaluating whether and when separate corporate entities, including parents and their subsidiaries, should be deemed the same entity, or held liable for the acts of the other. As the Court will discuss below, the Department of Labor has promulgated factors for courts to consider in determining whether corporate parents and subsidiaries can both be deemed an "employer" for purposes of the WARN Act. 20 C.F.R. § 639.3(a)(2) (2002). The factors are basically the same as what has been called, in the labor law context, the "single employer" or "integrated enterprise" test. *See, e.g., Swallows v. Barnes & Noble Book Stores, Inc.,* 128 F.3d 990, 993–94 (6th Cir.1997).

this Court would likely have personal jurisdiction over it, under the standard set forth above, and CNF makes no argument to the contrary. If it was not, then this Court would likely not have personal jurisdiction over it, for it would have no relationship to Ohio other than being the corporate parent of Emery, and the Plaintiffs make no argument to the contrary. Therefore, the analysis does not turn so much on the well known "minimum contacts" analysis, but, rather, on whether and to what degree CNF exercised control over Emery.

In enacting the WARN Act, Congress gave the Department of Labor ("DOL") authority to promulgate interpretive regulations. *See* 29 U.S.C. § 2107(a). Pursuant to that authority, that agency has considered the question presented herein. Factors to be considered in determining whether a subsidiary is part of or separate from the corporate parent for purposes of determining the proper employer include: (1) common ownership; (2) common directors and/or officers; (3) de facto exercise of control; (4) unity of personnel policies emanating from a common source; and (5) the dependency of operations. *See* 20 C.F.R. § 639.3(a)(2) (2002).

Thickpenny's uncontested affidavit confirms the following about Emery's subsidiary relationship to CNF and the two entities' common management: Emery is wholly owned by CNF; one of CNF's eleven directors, Gregory L. Quesnel, is also one of five Emery directors; Quesnel also serves as CNF's President and CEO and Emery's Chairman of the Board; Thickpenny himself is Emery's Treasurer; Keith A. Sawallich serves as CNF's Vice President of Administration while also serving as an Assistant Secretary at Emery; finally, Martin D. Eng and John A.

Tate serve as Assistant Treasurers to both CNF and Emery. Thickpenny's affidavit demonstrates also that personnel policies and operations decisions at the two entities are made separately, and tends to demonstrate that CNF did not exercise de facto control over Emery.

■ Although, as the Court has noted, a plaintiff cannot withstand a motion to dismiss for lack of personal jurisdiction on the strength of unsupported allegations alone, the question of whether CNF exercised a degree of control over Emery justifying this Court's holding it accountable as the Plaintiffs' de facto employer is a fact-sensitive question which, in this Court's opinion, should not be answered until the Plaintiffs have had some opportunity to conduct discovery on this matter. *See Midwest Fasteners*, 779 F.Supp. at 792 (stating that "the court is undertaking a fact-specific inquiry whereby the court must determine from a multiplicity of criteria whether the operations of the parent and subsidiary are so interrelated as to hold the parent liable for the violation of the WARN Act by the subsidiary"). Accordingly, to the extent it is one for dismissal for lack of personal jurisdiction, CNF's Motion to Dismiss is OVERRULED. This ruling is without prejudice to CNF raising the personal jurisdiction issue pursuant to a subsequent motion, the form of which the Court will discuss below, after the Plaintiffs have had sufficient time to conduct discovery on the relevant facts.

B. *Dismissal for Failure to State a Claim*

■ Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court may only consider the facts as pled in the Second Amended Complaint in deciding whether the Plaintiff has stated a valid claim.[3] *See Nelson v. Miller*, 170

**3.** Although CNF's Motion was filed prior to the Plaintiffs' filing of their Second Amended Complaint, the amendment is not material to the disposition of either portion of its Motion.

F.3d 641, 649 (6th Cir.1999). "A court should not dismiss a plaintiff's complaint under Rule 12(b)(6) unless, after construing the complaint in the light most favorable to the plaintiff and accepting all factual allegations as true, the court determines that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (citation omitted); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

The disposition of this portion of CNF's Motion turns on the same issue just discussed. CNF's argument is that it was not the Plaintiffs' employer, and therefore cannot be subject to liability under the WARN Act. Recognizing that Thickpenny's affidavit is outside the pleadings, it suggests that the Court convert its Motion into one for summary judgment, under Rule 56, as allowed by Rule 12(b). Its suggestion is well taken in principle. As the Court has already noted, this issue is fact-sensitive and better decided pursuant to Rule 56 than Rule 12(b)(6) (although, in the Rule 12(b)(2) context, as noted, the Court can consider, indeed must consider, matters outside the pleadings necessary to resolve the factual jurisdictional issue). However, for the reasons given below, instead of requiring supplemental briefs, the Court is more inclined to have the parties submit fresh briefs on the matter after sufficient time for discovery has been given. In the meantime, to the extent it is one to dismiss for failure to state a claim upon which relief can be granted, CNF's Motion is OVERRULED.

### C. *Style of CNF's Motion in Light of this Court's Ruling*

■ As is plain, CNF's arguments as to the issues of personal jurisdiction and failure to state a claim hinge on a single question: did it act in such a manner that it should be deemed one-in-the-same as Emery and, consequently, the Plaintiffs' employer for purposes of the WARN Act. Obviously, the answer has dispositive ramifications, jurisdictional and non-jurisdictional alike. While either a Rule 12(b)(2) motion or Rule 56 motion, unlike a Rule 12(b)(6) motion, allows the Court to consider matters outside the pleadings, at this point, it would seem to make more sense for CNF to style any renewed motion it might file as one for summary judgment, under Rule 56. This will allow it the flexibility to renew either or both of its theories for dismissal.[4]

### III. *Defendants' Motion to Strike Plaintiffs' Demand for a Jury Trial (Doc. # 28)*

The question raised in the Defendants' Motion to Strike Plaintiffs' Demand for a Jury Trial is whether the nature of relief provided by the WARN Act is legal or equitable. The Defendants' argue it is equitable; the Plaintiffs argue otherwise. This appears to be a case of first impression in the Sixth Circuit.

The Seventh Amendment to the United States Constitution provides that the right to trial by jury shall be preserved in suits at common law. The Supreme Court has held that by "suits at common law" the framers of the Seventh Amendment meant

---

4. The Court realizes that several months have passed since the last brief relating to this issue was filed, and that it is possible that sufficient discovery of facts relating to the question of corporate governance has already been conducted. Therefore, the Court will not establish a deadline of its own. Instead, CNF may file a renewed motion on this issue at its discretion, and if the Plaintiffs are of the belief that sufficient time for discovery on the issue has not been given, they can state their argument, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, and the Court will rule accordingly.

"not merely suits, which the common law recognized among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Curtis v. Loether*, 415 U.S. 189, 193, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) (citation omitted). The Seventh Amendment applies to actions prescribed by statute, as long as the damages available thereunder are "legal" in nature. *See id.* at 194, 94 S.Ct. 1005 ("Whatever doubt may have existed should now be dispelled. The Seventh Amendment does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law."). The existence of a right to "actual and punitive" damages is a strong indication that the suit is "legal" in nature and thus properly tried to a jury, but it is not necessary to consider a right to "any award of monetary relief" as being synonymous with a right to "legal" relief. *Id.* at 196, 94 S.Ct. 1005.

The Court's analysis begins with the words of the statute. The pertinent provision reads as follows:

(a) Civil actions against employers

(1) Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for—

(A) back pay for each day of violation at a rate of compensation not less than the higher of—

(i) the average regular rate received by such employee during the last 3 years of the employee's employment; or

(ii) the final regular rate received by such employee; and

(B) benefits under an employee benefit plan described in section 1002(3) of this title, including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred.

Such liability shall be calculated for the period of the violation, up to a maximum of 60 days, but in no event for more than one-half the number of days the employee was employed by the employer.

(2) The amount for which an employer is liable under paragraph (1) shall be reduced by—

(A) any wages paid by the employer to the employee for the period of the violation;

(B) any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation; and

(C) any payment by the employer to a third party or trustee (such as premiums for health benefits or payments to a defined contribution pension plan) on behalf of and attributable to the employee for the period of the violation.

In addition, any liability incurred under paragraph (1) with respect to a defined benefit pension plan may be reduced by crediting the employee with service for all purposes under such a plan for the period of the violation.

\*    \*    \*    \*    \*    \*

(4) If an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, re-

duce the amount of the liability or penalty provided for in this section.

\* \* \* \* \* \*

(6) In any such suit, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs.

\* \* \* \* \* \*

(b) Exclusivity of remedies

The remedies provided for in this section shall be the exclusive remedies for any violation of this chapter. Under this chapter, a Federal court shall not have authority to enjoin a plant closing or mass layoff.

29 U.S.C. § 2104. The Defendants focus on several aspects of this statute and its legislative history in arguing that it provides only for equitable relief, not for the type of relief that would trigger the right to a jury trial. *First*, they contend that paragraph (4) of subsection (a) indicates that the full extent of a plaintiff's right to relief is to be determined by the Court. *Second*, they contend that their argument is bolstered by paragraph (6) of subsection (a), which grants the Court the right to determine, at its discretion, whether the prevailing party should be awarded attorney's fees as part of costs. *Third*, they direct the Court's attention to a Senate Report announcing the features of the law, which they contend adds further support to the argument that jury trials were not contemplated by Congress. *See* S.Rep. No. 100–62 (1987).[5]

With respect to their third argument, the Defendants cite a comment in the Senate Report which suggests that the damages provision under the Act "is in effect a liquidated damages provisions [sic], designed to penalize the wrongdoing employer, deter future violations, and facilitate simplified damages proceedings." *Id.* at 24. Regarding the right of a court to reduce the amount of damages under paragraph (4) of subsection (a), the Senate Report states that "[t]his provision is modeled after section 11 of the Portal–to–Portal Act, 29 U.S.C. sec. 260 and is to be interpreted in accordance with the prevailing law under that section." *Id.* at 25. The Portal–to–Portal Act was enacted in 1947, and Section 11 of that Act gives a court the right to reduce an award of liquidated damages imposed under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq.* ("FLSA"), where an employer can demonstrate "to the satisfaction of the court" that it acted in "good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act." The Sixth Circuit remarked in *McClanahan v. Mathews* that since "an award of liquidated damages is left to the 'sound discretion' of the court, it is to be

---

5. This report, which is not reprinted in the United States Code and Administrative News, accompanied S. 538, submitted during the first session of the 100th Congress. At the time, the Senate bill was entitled, "Economic Dislocation and Worker Adjustment Assistance Act" ("EDWAAA"), and was introduced as an amendment to Title III of the Job Training Partnership Act, 29 U.S.C. § 1651, *et seq.* The final bill to which that amendment was appended, H.R. 3, was vetoed by President Reagan on May 24, 1988. *See* H.R. Conf. Rep. No. 100–576, note following caption (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547 (Vol.4). The substance of H.R. 3 was subsequently resubmitted, and, in conference, that portion requiring the advance notification of plant closings and mass layoffs, originating with S. 538, was severed from the EDWAAA, and repackaged as its own bill. *See id.* at 1045, *reprinted in* 1988 U.S.C.C.A.N. at 2078 (Vol.5). (The remainder of what was H.R. 3 would be enacted into law as Pub.L. No. 100–418.) A new bill, S. 2527, was submitted in the second session of the 100th Congress, and it was this bill which would become the WARN Act. *See* Act of August 4, 1988, Pub.L. No. 100–379, 1988 U.S.C.C.A.N. (102 Stat.) 890.

granted, or denied, by the court, as opposed to the jury." 440 F.2d 320, 322 (6th Cir.1971). Given this report, and the Sixth Circuit's holding in *McClanahan*, the Defendants' argue that it is clear that Congress intended for the suits arising under the WARN Act to be tried to the Court.

The Plaintiffs argue to the contrary, contending that the WARN Act is similar in structure to the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA"), and the FLSA, both of which have been construed to provide for jury trials to decide liability and damages. *See, e.g., Frizzell v. Southwest Motor Freight*, 154 F.3d 641, 643–44 (6th Cir.1998).

Only a few federal courts have looked at whether damages available under the WARN Act are legal or equitable in their nature. The District Court for the Eastern District of Arkansas held that the relief was legal in nature, and that jury trials were therefore proper. *See Bentley v. Arlee Home Fashions, Inc.*, 861 F.Supp. 65 (E.D.Ark.1994). The *Bentley* court relied heavily on another piece of legislative history, that being the Senate floor debates on the bill that would ultimately become the WARN Act, S. 2527. (*See supra* note 5.) In particular, the court noted the comments of Senator Orrin Hatch, an outspoken critic of the bill. Senator Hatch, who had opposed the prior notice provision from its inception (*see* S.Rep. No. 100–62, at 83–87 (Minority Views of Senator Hatch)), derided S. 2527 for, among other things, allowing juries to decide the liability of employers faced with making tough business decisions resulting in mass layoffs and plant closings. *See* 134 Cong. Rec. S8449–01 (June 23, 1988), 1988 WL 172680 (statement of Sen. Hatch) & 134 Cong. Rec. S8598–01 (June 27, 1988), 1988 WL 172881 (statement of Sen. Hatch). In his Senate floor statement of June 27, 1988, Senator Hatch noted the following as one of many components of the bill he did not like:

### NO. 11. JURY TRIALS

This legislation allows any aggrieved employee or unit of local government to file a civil action against an employer. This action includes the right to a jury trial. Juries are comprised of members of the community—neighbors and friends of those who have been affected directly by the layoff or closure. Let's look at this realistically. Layoffs, even when they are clearly necessary and justifiable, are not welcome news in any community. I have some empathy with the employer who is forced to take such action. Laying off two-thirds of my committee staff after the 1986 election was one of the hardest things I've ever had to do as a Senator. But we still have to question whether the publicity, deliberations, and outcome of a jury trial under these circumstances would be truly objective and fair.

The *Bentley* court went on to consider the nature of relief contemplated by § 2104(a)(1), and the fact that courts were not given the authority to enjoin mass layoffs or plant closings, § 2104(b), and concluded that the relief provided was legal in nature. 861 F.Supp. at 67–68. In *Loehrer v. McDonnell Douglas Corp.*, 1992 U.S. Dist. LEXIS 22555 (E.D.Mo. Oct. 5, 1992), the District Court for the Eastern District of Missouri held differently. It noted two points. *First*, it found that the right to back pay under the WARN Act was similar to the right to back pay provided by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and that prior to the Civil Rights Act of 1991, which amended Title VII to provide for jury trials, the courts had construed Title VII as not providing for such. 1992 U.S. Dist. LEXIS 22555, at *7–8. *Second*, it considered probative then Justice Rehn-

quist's concurring opinion in *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 443, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (Rehnquist, J., concurring), a Title VII case in which the question of a right to a jury trial was not actually at issue, in which the Justice stated:

> To the extent, then, that the District Court retains substantial discretion as to whether or not to award backpay notwithstanding a finding of unlawful discrimination, the nature of the jurisdiction which the court exercises is equitable, and under our cases neither party may demand a jury trial.

Because § 2104(a)(4) grants a court discretion to reduce the award of back pay, without limitation, the *Loehrer* court held that the damages available under § 2104(a)(1) were equitable in nature, and that no jury trial was permitted. 1992 U.S. Dist. LEXIS 22555, at * *9–10.

Though not specifically addressing the right to a jury trial, the United States Bankruptcy Court for the District of Delaware followed the *Loehrer* decision, and rejected *Bentley,* in holding that the form of relief available under the WARN Act is equitable in nature. *See Cain v. Inacom,* 2001 WL 1819997, at *1 (Bkrtcy.D.Del. Sept. 26, 2001) (ruling that a WARN Act claim could be pursued as an adversary proceeding against a bankruptcy petitioner).

The WARN Act offers no indication on its face as to what Congress intended with respect to jury trials. Thus, the Court must examine both the nature of the issues involved and the remedy sought. *See Wooddell v. International Broth. of Elec. Workers, Local 71,* 502 U.S. 93, 97, 112 S.Ct. 494, 116 L.Ed.2d 419 (1991). "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether

it is legal or equitable in nature." *Id.* (citing *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 565, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990)) (internal quotation marks omitted). The second inquiry is the more important of the two. *See id.*

The Plaintiffs herein do not attempt to analogize their WARN Act claim to a pre-merger action at law. The *Bentley* court suggested that it might be compared to an action for breach of contract or one for personal injury due to wrongful termination, both actions at law. 861 F.Supp. at 67–68. This Court does not agree with the analogy to a breach of contract action. The Plaintiffs have not suggested they had an agreement of their own with Emery requiring it to provide them with 60 days' notice of a mass layoff or plant closing, and it is difficult to conceive how this action could otherwise compare to one for a breach of contract.

In comparing this type of action to one for personal injury arising out of a wrongful discharge, the *Bentley* court cited *Wooddell, supra,* in which the Supreme Court held that employees subjected to discrimination by their union representatives in violation of the Labor–Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401, *et seq.* ("LMRDA"), have the right to a jury trial. In *Reed v. United Transp. Union,* 488 U.S. 319, 325–27, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989), the Court had noted that the aim of the LMRDA was to afford union members the ability to speak out freely about union leadership corruption and abuse, and that actions brought for violations of such rights were comparable to personal injury actions in state court. Citing *Reed,* the *Wooddell* Court noted that "[a] personal injury action is of course a prototypical example of an action at law, to which the Seventh Amendment applies."

502 U.S. at 98, 112 S.Ct. 494. In this Court's opinion, the *Bentley* court's reference to *Wooddell* also misses the mark. The LMRDA action at issue therein was filed in response to the plaintiff's union representative's having discriminated against him for openly opposing them on certain issues. The harm was the discrimination against the union member for expressing his views, and part of the relief he was seeking was money damages. The plaintiff's right of action was 29 U.S.C. § 412, which allows a party aggrieved under the LMRDA to "bring a civil action in a district court of the United States for such relief (including injunctions) *as may be appropriate*" (emphasis added). That provision is far broader than the very limited and definite relief available under the WARN Act.

A better comparison might be made to a breach of fiduciary duty cause of action, the fiduciary duty being that of an employer to safeguard the welfare of its employees by giving them at least 60 days' notice of any impending mass layoff or plant closing, or, in the absence thereof, remuneration for the number of working days for which it should have given advance notice, but did not. If viewed in this light, the employer might be seen as a trustee, and the relief sought, that being back pay and benefits for a limited, definite time period, might be viewed as funds wrongly managed or withheld by the trustee. Damages, therefore, would be in the nature of restitution, an equitable remedy. *See, e.g., Terry*, 494 U.S. at 567, 110 S.Ct. 1339 (observing that "an action by a trust beneficiary against a trustee for breach of fiduciary duty" was "within the exclusive jurisdiction of the courts of equity"); *Kalish v. Franklin Advisers, Inc.*, 928 F.2d 590 (2nd Cir.) (holding that a claim under the Investment Company Act of 1940, 15 U.S.C. § 80a–35, for breach of duty to recover excessive fees was equitable in nature), *cert. denied*, 502 U.S. 818, 112

S.Ct. 75, 116 L.Ed.2d 48 (1991); *In Re Frank J. Evangelist, Jr.*, 760 F.2d 27, 29 (1st Cir.1985) ("Actions for breach of fiduciary duty, historically speaking, are almost uniformly actions 'in equity'—carrying with them no right to trial by jury.") (Breyer, J.).

Putting aside for the moment how best to characterize the Plaintiffs' WARN Act claim as a whole, the Court will turn to the "more important" inquiry, and focus more carefully on the nature of the relief sought. *Terry* is where the Court must begin. The question in that case was whether an action by union members against their union representatives for breach of their duty of fair representation, arising under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), could be tried to a jury. 494 U.S. at 563, 110 S.Ct. 1339. The plaintiffs' underlying grievance was that the union representatives had allegedly failed to adequately represent their interests during successive rounds of layoffs and recalls by their employer, all of which resulted in lost wages, health benefits and seniority. *Id.* at 561–62, 110 S.Ct. 1339. The controlling statute in that case reads:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a) (§ 301(a)). The plaintiffs sought restitution of seniority status, an injunction requiring the union representatives to cease refusing to represent their interests, and compensatory damages for lost wages and benefits. 494 U.S. at 562–63, 110 S.Ct. 1339.

The Court had difficulty characterizing the precise nature of the suit, finally concluding that it had both equitable and legal elements. "When viewed in isolation, the duty of fair representation issue is analogous to a claim against a trustee for breach of fiduciary duty. The § 301 issue, however, is comparable to a breach of contract claim—a legal issue." *Id.* at 569–70, 110 S.Ct. 1339. Turning to the nature of the relief sought, the Court characterized the back pay as legal in nature: "The backpay sought by respondents is not money wrongfully held by the Union, but wages and benefits they would have received from McLean had the Union processed the employees' grievances properly. Such relief is not restitutionary." *Id.* at 570–71, 110 S.Ct. 1339. In stating as much, the Court distinguished back pay available under Title VII, which the lower courts had historically held did not provide for legal relief and jury trials. At that time, Title VII gave courts the authority to enjoin unlawful employment practices, order appropriate affirmative action, including reinstatement or the hiring of the employee, *with or without back pay,* and any other equitable relief deemed appropriate by the court. *Id.* at 572, 110 S.Ct. 1339. This type of back pay, the Court stated, was "restitutionary" in nature. *Id.*[6]

Several other cases also merit discussion. In *Lorillard v. Pons,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), the Supreme Court held that plaintiffs suing under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"), were entitled to a jury trial. That Act provided, at the time: "Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effec-

tuate the purposes of this chapter...." *Lorillard,* 434 U.S. at 579 n. 6, 98 S.Ct. 866.[7] The Court noted that the ADEA was to be enforced in accordance with the procedures established by the FLSA, *id.* at 579, 98 S.Ct. 866, the latter being a law which the lower courts had uniformly held granted a right to a jury trial. *Id.* at 580, 98 S.Ct. 866. As it would later do in *Terry,* the Supreme Court distinguished the availability of back pay in the Title VII context, which it had deemed "a matter of equitable discretion" for the courts. *Id.* at 584, 110 S.Ct. 1339. *Accord Curtis,* 415 U.S. at 197, 94 S.Ct. 1005 (noting how courts, in the Title VII context, "have relied on the fact that the decision whether to award backpay is committed to the discretion of the trial judge"); *Albemarle,* 422 U.S. at 443, 95 S.Ct. 2362 (Rehnquist, J., concurring). Because of the availability of legal *or* equitable relief under the ADEA, the Supreme Court held that jury trials were proper thereunder. *Id.* at 585, 110 S.Ct. 1339 ("Nor can we believe that in using the word 'legal,' Congress was oblivious to its long-established meaning or its significance."). In voicing his opposition to S. 2527, the bill which ultimately became the WARN Act, Senator Hatch made express reference to the *Lorillard* decision as that which he foresaw would provide the basis for opening up WARN Act claims to jury trials. 134 Cong. Rec. S8449–01 (June 23, 1988), 1988 WL 172680.

In *Frizzell,* 154 F.3d 641, the Sixth Circuit held that the FMLA provides a right to a jury trial. The appellate court looked at the structure of the damages provision contained in that statute, which states as follows:

(1) Liability

---

6. Title VII was amended in 1991 to provide for jury trials in actions where the plaintiff seeks compensatory or punitive damages. 42 U.S.C. § 1981a(c).

7. The ADEA was amended in 1978 to provide for jury trials expressly. 29 U.S.C.A. § 626(c)(2) & Historical and Statutory Notes.

Any employer who violates section 2615 of this title shall be liable to any eligible employee affected—

(A) for damages equal to—

(i) the amount of—

(I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or

(II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks of wages or salary for the employee;

(ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and

(iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively; and

(B) for such equitable relief as may be appropriate,

including employment, reinstatement, and promotion.

(2) Right of action

An action to recover the *damages or equitable relief* prescribed in paragraph (1) may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of—

(A) the employees; or

(B) the employees and other employees similarly situated.

(3) Fees and costs

The court in such an action shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant.

29 U.S.C. § 2617(a) (emphasis added).

In the Sixth Circuit's opinion, the fact that the right to "equitable relief" was set forth under a different sub-paragraph of paragraph (1) than the right to "damages" generally, and was also distinguished from the right to "damages" in paragraph (2), showed a clear intent on the part of Congress to provide for jury trials, at least for the purpose of deciding the legal, as opposed to equitable, issues. 154 F.3d at 643–44 ("While Congress's intent would be clearer if the FMLA included the word 'legal' to label damages ..., the FMLA's division between 'damages' and 'equitable relief' still indicates an intent to make juries available."). It also found that the legislative history supported a finding that the FMLA was modeled on the FLSA, which, as noted by the Supreme Court in *Lorillard,* had long been construed as providing for jury trials. *Id.* at 644. Finally, it noted the comments of several members of the House of Representatives who had opposed the FMLA's passage, all expressing reservation with the right to a jury trial thereunder. *Id.*

■ Not surprisingly, in addition to *Bentley,* the Plaintiffs rely heavily on the Sixth Circuit's opinion in *Frizzell,* arguing that the damages available under the WARN Act are like those available under

the FMLA and FLSA, and therefore "legal" in their nature. Having considered this matter thoroughly, the Court finds that Congress did not intend plaintiffs to have a jury determine damages in WARN Act cases.

The Court is not persuaded by the reasoning employed in the *Bentley* decision, and finds the floor comments of Senator Hatch, an opponent of the law, to be of limited value. *See National Labor Relations Bd. v. Fruit and Vegetable Packers and Warehousemen, Local 760,* 377 U.S. 58, 66, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) ("The fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to when the meaning of the statutory words is in doubt."). Of course, the Senate Report invoked by the Defendants is also of little persuasive value. The comments noted by the Defendants reveal little about the statute, and the report's relevance as a whole becomes even more questionable when one considers the fact that it was not submitted with the bill which ultimately became the WARN Act. (*See supra* note 5.) In the Court's opinion, a determinative factor is that the language of the WARN Act is, simply, not akin to that of the FMLA, the ADEA, the FLSA or the LMRA.

The FMLA, as pointed out by the Sixth Circuit in *Frizzell,* and as set out above, provides for two distinct categories of relief: "damages" and "equitable relief." They are set out separately in the statute. Included in the damages provision is a right to "any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; ... or in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks of wages or salary for the employee." Furthermore, the statute provides for an award of double damages, defined as "liquidated damages," but allows a court to cancel that award if it determines, in its discretion, that it should not be awarded. However, a court may not amend in any fashion the underlying award of legal damages. Similar remedies are provided under the ADEA and the FLSA. *See Lorillard, supra.* The WARN Act, by contrast, contains no such distinct provisions. It allows only for a maximum of 60 days' worth of back pay and lost health benefits. What is more, the award may be reduced or eliminated in its entirety at the discretion of the court, and damages not specifically defined in that provision may not be awarded. It is simple and straightforward; nothing is left to debate. There is, therefore, little need for the fact finding function of the jury.

*Terry* prevents a more difficult case, because the Supreme Court held in that case that "back pay" under § 301(a) of the LMRA is "legal" in nature. That itself might prove dispositive if not for the Supreme Court's frequent admonitions that "back pay" in the Title VII context is "equitable" in nature. *See United States v. Burke,* 504 U.S. 229, 238, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992); *Terry,* 494 U.S. at 572, 110 S.Ct. 1339; *Lorillard,* 434 U.S. at 584, 98 S.Ct. 866; *Curtis,* 415 U.S. at 197, 94 S.Ct. 1005; *Albemarle,* 422 U.S. at 416–21, 95 S.Ct. 2362 (discussing the award of back pay as being within the equity power of the court); *id.* at 443, 95 S.Ct. 2362 (Rehnquist, J., concurring). Obviously, the availability of "back pay" does not control the outcome.

Cases arising under § 502(a) of the Employee Retirement and Income Security Act, 29 U.S.C. § 1132(a) ("ERISA"), provide further guidance. Generally stated,

ERISA governs certain employee benefits plans, such as health insurance plans, pension plans, and disability benefits plans, and provides a right of action for covered employees to recover said benefits when such have been wrongfully denied. *See* 29 U.S.C. § 1132(a)(1)(B). In *Schwartz v. Gregori,* 45 F.3d 1017, 1021 (6th Cir.), *cert. denied,* 516 U.S. 819, 116 S.Ct. 77, 133 L.Ed.2d 36 (1995), the Sixth Circuit recognized a claim for retaliatory discharge by an employee against her employer, under § 510 of ERISA, 29 U.S.C. § 1140. Pursuant to such a claim, the court recognized that a plaintiff could sue for back pay and front pay. Actions undertaken pursuant to § 510 are enforceable through § 502. The question put to the court was whether back and front pay were equitable or legal in nature. 45 F.3d at 1021. If legal, such could not be awarded because no such relief is provided for in § 502. If equitable, however, such could be awarded as "appropriate equitable relief" under § 502(a)(3), 29 U.S.C. § 1132(a)(3). After considering the same Supreme Court opinions considered herein on the character of "back pay," the court held that back pay sought pursuant to a retaliatory discharge claim under ERISA is equitable in nature. *Id.* at 1022–23. The Court held that under a restitution theory, "a court may restore the plaintiff to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its equivalent in money." *Id.* at 1022 (citation and internal quotation marks omitted).

Although the analogy is not perfect, the Court finds that the back pay contemplated by Congress in crafting the WARN Act is more like that which the Sixth Circuit held was available under ERISA in *Schwartz,* and that available in Title VII actions, than that which the Supreme Court recognized was available under the LMRA in *Terry.* The LMRA provision at issue in *Terry* (§ 301(a)) gave the plaintiff therein the right to sue for breach of contract generally, and back pay was one type of legal relief he sought thereunder. The WARN Act damages provision, 29 U.S.C. § 2104(a), is not nearly as broad, and it is also far less broad than that which is available under the FMLA, FLSA or the ADEA. For example, whereas the FMLA states that "in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee," the employee is entitled to "any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks of wages or salary for the employee," the WARN Act contains no such alternative damages provision. Under no set of facts is an employee suing under the WARN Act entitled to any form of relief other than back pay and lost benefits (and fees as a part of overall costs). The Court is also persuaded that its authority to reduce the entire portion of any calculated damages, 29 U.S.C. § 2104(a)(4), indicates an intention on the part of Congress to exclude the right to a jury trial. *See Curtis,* 415 U.S. at 197, 94 S.Ct. 1005; *Albemarle,* 422 U.S. at 443, 95 S.Ct. 2362 (Rehnquist, J., concurring).

The alleged "wrong" in this case is not Emery's act of laying off the Plaintiffs; it is its failure to give them adequate notice of its plan to do so or adequate remuneration in lieu thereof. Through the WARN Act, Congress has stated to large employers, in effect, that it is okay to lay off employees, but in return they must be given 60 days' notice or, if not, then the remuneration they would have received for the number of days for which they were entitled to prior notice. Indeed, an employer which has given inadequate notice of discharge may compensate its employees according to 29 U.S.C. § 2104(a)(1) as they walk out the door upon their being laid off, and if it does so, it has no further

liabilities to them. In essence, then, what the Plaintiffs herein are seeking is not compensation for the damages flowing from their discharge, but a reimbursement of those salaries and benefits, calculated on a per diem basis, which were due to them on the date they were laid off, in lieu of Emery's having given them proper notice of their layoffs, and which have to this point in time been wrongly withheld from them. Therefore, if Emery is indeed liable, it is so in a manner similar to that of a trustee who is liable for wrongly withholding funds, in breach of its fiduciary duty to do so. Viewed in this light, the back pay and benefits which the Plaintiffs seek are in the nature of restitution, for which no right to a jury trial exists.

Moreover, the right to lost benefits is itself probative of how the statute should be construed. ERISA allows aggrieved employees the right "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). The Sixth Circuit has consistently held that such actions are in the nature of actions for restitution, and are therefore equitable in nature, for which no entitlement to a jury trial exists. *See Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 616 (6th Cir.1998); *Bair v. General Motors Corp.*, 895 F.2d 1094, 1097 (6th Cir.1990); *Daniel v. Eaton Corp.*, 839 F.2d 263, 268 (6th Cir.), *cert. denied*, 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988), *cert. denied*, 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988); *Crews v. Central States, Southeast and Southwest Areas Pension Fund*, 788 F.2d 332, 338 (6th Cir.1986). These cases are significant because the lost benefits available under the WARN Act are ERISA benefits (i.e., "benefits under an employee benefit plan described in section 1002(3) of this title"). *See* 29 U.S.C. § 2104(a)(1)(B); *id.* § 1002(3). The Act provides no right to sue for benefits other than those arising under an ERISA plan, and it seems unlikely that Congress would have intended

plaintiffs to be entitled to a jury's determination of lost ERISA benefits under the WARN Act where they would not be entitled to one under ERISA itself.

The *Loehrer* and *Cain* courts both found this fact highly relevant, the *Loehrer* court going to far as to deem the award of back pay "equitable relief because such an award is intertwined with the equitable relief of ERISA benefits." It found support for this proposition in the Supreme Court's decision in *Terry*, where the Court stated that "a monetary award 'incidental to or intertwined with injunctive relief' may be equitable." 494 U.S. at 571, 110 S.Ct. 1339 (quoting *Tull v. United States*, 481 U.S. 412, 424, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987)); *see also Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291–92, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960) (holding that a district court could award back pay, described therein as a "reimbursement" of lost wages, pursuant to its equitable powers). In this case, back pay is not "incidental" to the award of ERISA benefits, but it is "intertwined" with such, and it bears noting that in other settings, too, the Sixth Circuit has described back pay as equitable. *See Coleman v. General Motors Acceptance Corp.*, 296 F.3d 443, 450 (6th Cir.2002). In fact, in *Coleman*, the court quoted with approval a Fifth Circuit case, *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir.1998), for the proposition that back pay could be distinguished from compensatory damages, in the Title VII context, " 'as an equitable remedy similar to other forms of affirmative injunctive relief.' " 296 F.3d at 450.

For these reasons, the Court finds that the Plaintiffs are not entitled to a jury trial under the WARN Act. Therefore, the Defendants' Motion to Strike Plaintiffs' Demand for a Jury Trial is SUSTAINED.

IV. *Plaintiffs' Motion for Class Certification (Doc. # 20)*

The Plaintiffs move for certification of their class under Rule 23 of the Federal Rules of Civil Procedure. That Rule states, in pertinent part:

(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

In so moving, they have invoked the grounds stated in subdivisions (b)(1)(A), (2) and (3). (Doc. # 20 at 14–18.)

Emery does not oppose class certification as a general matter, and would stipulate to the following defined class, with one exception upon which the Court will elaborate below: All persons, of about 575 in number,[8] who were employed by Emery at its Vandalia, Ohio, facility as of August 13, 2001; who were notified by Emery between August 13 and 15, 2001, of their subsequent layoffs; who were notified by Emery on December 5, 2001, that their layoffs were permanent; and who did not receive 60 days' notice or 60 days' pay in lieu thereof for the mass layoff that began on August 14, 2001, and which was deemed permanent on December 5, 2001. (Proposed Agreed Stipulation Regarding Class Certification, attached to Defs.' Memo. in Opp. (Doc. # 26).) Emery also agrees that class certification would be appropriate pursuant to Rule 23(b)(2) and/or (3).

---

**8.** This is fewer than the approximately 800 stated in the Second Amended Complaint, but the Plaintiffs do not oppose this aspect of Emery's proposed stipulation.

The Plaintiffs raise three points in their Reply Memorandum (Doc. # 27). *First,* they would not limit the class to only those former Emery employees who had worked in Vandalia, but would broaden it to include other former Emery employees employed at other work sites subject to the WARN Act protection. *Second,* they would broaden the class to include employees who were not laid off until September, 2001, and whose temporary layoffs also became permanent on December 5, 2001. *Third,* they would have the Court determine that class certification is proper under Rule 23(b)(1)(A), in addition to (b)(2) & (3). Its stated preference is for the Court to certify the class under (b)(1)(A) or (b)(2). (Doc. # 20 at 14 & 18.)

■ The Court agrees that the aims of class certification appear to be met in this case. The proposed class members are so numerous that joinder of all would be impracticable; there are obvious common questions of law and fact; the claims of the named Plaintiffs are typical of those of the class; and there is no appearance that the named Plaintiffs or their counsel could not fairly and adequately represent the class. The Court does not agree, at this juncture, that the class should include former employees of Emery at sites other than Vandalia or former employees who were laid off subsequent to August 15. As for the former category, no such individuals are contemplated by the Second Amended Complaint, and the Plaintiffs make no attempt to qualify the parameters of their proposed broadened definition. Likewise, the Complaint makes no mention of individuals laid off after August 15, 2001, and although the Plaintiffs have submitted with their Reply Memorandum (Doc. # 27) what is purported to be a spread sheet of all Emery employees laid off in 2001 and 2002, the Court has not been made aware of the reasons for any layoffs after August 15, 2001, and it is not inclined at this point to recognize such individuals as proper members of the class. This is not to say that the class cannot be broadened to include such individuals, *see* Rule 23(c)(1), only that the Court is not inclined to certify a class inclusive of them at this time. The Plaintiffs may move for leave to amend their Complaint to name new individuals, if they have a fair basis for doing so, and may at that point renew their argument to include such individuals in the class.

Before they do so, however, a related issue must be addressed, and this concerns the exception which Emery has raised to its stipulation to the certification of the putative class. In a Supplemental Memorandum in Opposition to Plaintiffs' Motion for Class Certification, Emery states that it maintained several facilities in and around Vandalia at the time of the Plaintiffs' layoff, and that the class should be limited to those former Vandalia employees who worked at Emery's airport hub. (Doc. # 42 at 3.) It argues that the class should not include any former employees who worked at other Emery sites in or around Vandalia, which it states were not part of its operations at the airport hub. (*Id.*) This raises several legal questions. The strictures of the WARN Act are site specific, to wit: in order for a mass layoff or plant closing to be actionable under the Act, it must occur at a "single site" of employment. For example, a layoff of 200 employees would constitute a "mass layoff" if all of the affected employees worked at a "single site," provided the other elements of the definition of "mass layoff" were met, but a layoff of 200 employees would not constitute a "mass layoff" if it affected 20 employees at each of ten different sites maintained by the same employer. The same methodology applies to "plant closings." *See* 29 U.S.C. § 2101(a)(2) & (3).

The relevant DOL regulation states that "a group of contiguous locations" or sepa-

rate locations "within reasonable geographic proximity" can constitute a "single site," but that "[n]on-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site." 20 C.F.R. § 639.3(i). The questions raised, therefore, are two: (1) is it true that some of the individuals contemplated in the Plaintiffs' action did not work at the same site as the other putative class members, and, if so, (2) how, if at all, does that fact affect the right of those individuals to take part in this litigation? Because the Plaintiffs have not yet had opportunity to respond to this new issue, the Court will hold off on addressing it further. However, before the Plaintiffs seek any such leave to amend their Complaint to re-define their putative class, the Court believes that these questions of fact should be addressed, and it will schedule a conference call to establish the steps to be taken in furtherance of this aim.

For the time being, it is enough to note that the Court agrees with the parties that class certification is appropriate, but that the scope of the class must be left for subsequent determination. With that said, the Court now must consider the proper basis or bases for certifying the class under subdivision (b). At the moment, there does not appear to be any legal distinction between the claims of the individual Plaintiffs, named or otherwise, and the only factual distinction is the amount of back pay and lost benefits to which each would be entitled. While this latter point will require many individualized calculations, that would be a mere administrative task. *See, e.g., Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,* 244 F.3d 1152, 1163 (9th Cir.) ("Individualized issues are few, and most of them are likely to be relatively easy. For example, the damages for individual class members will entail a straightforward calculation of which days and how

many hours they would have worked, and how much they would have earned in tips."), *cert. denied,* 534 U.S. 973, 122 S.Ct. 395, 151 L.Ed.2d 299 (2001).

■ With this in mind, the Court finds that class certification is proper under Rule 23(b)(3) for the following reasons: (1) the commonality of the legal and factual issues and questions which would be inherent to any individual claims against Emery override the fact that individual attention will need to be given to the proper amount of back pay and benefits for each class member; (2) the Court has not been made aware of pending litigation in another court involving these parties and this particular set of facts; (3) court costs and judicial economy and efficiency will be served better by answering the common questions in a single proceeding than by leaving each putative class member to pursue his or her individual claim in court; and (4) this is a proper forum for the action, given the local residency of the Plaintiffs and Emery, and to the extent the action will not be convenient to any individual, the Court will make sure that each has the opportunity to opt out of the class upon receiving notification of the action. *See* Rule 23(c)(2). The Ninth Circuit, addressing similar circumstances in *Las Vegas Sands, supra,* determined that Rule 23(b)(3) was proper where a large number of employees sought like damages owing to the same causative event. This Court agrees. Accordingly, the Court finds that the questions of law or fact common to the members of the class will predominate over any questions affecting only individual members, and that a class action will be superior to other available methods for the fair and efficient adjudication of the controversy. In the words of one of the advisory committee notes on Rule 23(b)(3), this is a case "in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision

as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Therefore, the Court will certify the proposed class pursuant to Rule 23(b)(3).

On the other hand, the Court does not believe that class certification under paragraphs (1) or (2) of subdivision (b) would be proper. Paragraph (2) applies in situations where the only relief sought is injunctive or declaratory relief. *See Coleman*, 296 F.3d at 446. As the Court noted above, the relief sought herein, back pay and benefits, is equitable in nature, the award of which has been characterized in other cases as being similar to "other forms of affirmative injunctive relief." *See id.* at 450. Furthermore, the Sixth Circuit has held that "[a] request for back pay does not preclude certification under" Rule 23(b)(2). *Alexander v. Aero Lodge No. 735, Int'l Ass'n of Machinists and Aerospace Workers*, 565 F.2d 1364, 1372 (6th Cir.1977), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1978). Despite these observations, the Court finds that this case is not suited for certification under paragraph (2). At its core, this form of class certification is proper in situations in which one party is performing in a manner harmful to many others, making the availability of a single, broad-based injunction of the ongoing harmful performance appealing. *See Coleman*, 296 F.3d at 447–450. It applies when the interests of the class are homogenous, without divergent or conflicting interests. *Id.* at 447–448. While that standard does not necessarily pose a problem in this case, there is another factor which does: certification under paragraph (2) does not give the unnamed class members a right of notice and opportunity to opt out of the class. Where money damages are sought, be they characterized as legal or equitable in nature, certification under paragraph

(3), with its greater protections of individual interests, better serves the individual members of the class than does paragraph (2). *Cf. id.* at 448 ("Accordingly, close scrutiny is necessary if money damages are to be included in any mandatory class in order to protect the individual interests at stake and ensure that the underlying assumption of homogeneity is not undermined.").

Paragraph (1) certification is also not appropriate. To begin with, it, as with paragraph (2), does not provide for individual notice and opportunity to opt out of the class, which is troublesome where calculations of back pay and benefits must be made on an individual basis. As an additional matter, clause (A) of paragraph (1), under which the Plaintiffs seek class certification, is applicable where there is a need for uniform adjudication with respect to the status quo, such as multiple grievances regarding a proposed action of a municipality, or multiple grievances stemming from a public nuisance, such that individual adjudications might lead to incompatible standards of conduct for the party opposing the class. *See* Rule 23 advisory committee's note. Even if a putative class member were to opt out, as one is entitled to do where the class has been certified under Rule 23(b)(3), there is little chance that he or she would be subject to a divergent result in a subsequent, individual action. Because the facts as stated herein, as with the governing law, are straightforward and uncomplicated, there is little reason to think the outcome of individual actions would result in varying determinations of Emery's legal rights and obligations vis-a-vis the former employees contemplated in this action. That being the case, the Court does not find that there is a need for a "mandatory class action," as contemplated by Rule 23(b)(1)(A).[9] *See Ortiz v. Fibreboard*

---

9. Certification under Rule 23(b)(1)(B), not

sought by the Plaintiffs, would also be inap-

*Corp.*, 527 U.S. 815, 833 n. 13, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999).

Accordingly, the Court shall SUSTAIN IN PART and OVERRULE IN PART the Plaintiffs' Motion for Class Certification (Doc. # 20). It is sustained to the extent it seeks certification under Fed.R.Civ.P. 23(a) & (b)(3). In sustaining their Motion, the Court shall tentatively certify the class to the extent it is defined in the proposed Stipulation Regarding Class Certification, attached to the Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification (Doc. # 26). This certification is conditional, subject to the outstanding questions of fact concerning the precise scope of the class. *See* Rule 23(c)(1). It is overruled in all other respects.

The Court will schedule a conference call to discuss what steps must be taken in order for the Court to make a final determination on the precise scope of the class, and the subsequent procedures necessary for purposes of notifying the putative class of this action, pursuant to Rule 23(c)(2).

## V. *Conclusion*

For the reasons and citations of authority provided herein, the Court OVERRULES CNF's Motion to Dismiss for Lack of Personal Jurisdiction and for Failure to State a Claim Upon Which Relief May be Granted (Doc. # 11); the Court SUSTAINS the Defendants' Motion to Strike Plaintiffs' Demand for a Jury Trial (Doc. # 28); and the Court SUSTAINS IN PART and OVERRULES IN PART Plaintiffs' Motion for Class Certification (Doc. # 20). It is sustained to the extent it seeks certification under Fed.R.Civ.P.

23(a) & (b)(3). In sustaining their Motion, the Court shall tentatively certify the class to the extent it is defined in the proposed Stipulation Regarding Class Certification, attached to the Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification (Doc. # 26), to wit: All persons, of about 575 in number, who were employed by Emery at its Vandalia, Ohio, facility as of August 13, 2001; who were notified by Emery between August 13 and 15, 2001, of their subsequent layoffs; who were notified by Emery on December 5, 2001, that their layoffs were permanent; and who did not receive 60 days' notice or 60 days' pay in lieu thereof for the mass layoff that began on August 14, 2001, and which was deemed permanent on December 5, 2001. This certification is conditional, subject to the outstanding questions of fact concerning the precise scope of the class. The Plaintiffs' Motion for Class Certification is overruled in all other respects.

Counsel of record should take note that a telephone conference call has been scheduled for Thursday, April 3, 2003, at 8:40 a.m., to discuss what steps must be taken in order for the Court to make a final determination on the precise scope of the class, and the subsequent procedures necessary for purposes of notifying the putative class of this action, pursuant to Rule 23(c)(2). In addition, the viability of the August 18, 2003, trial date will be discussed.

---

propriate, because that provision is intended to be employed where, for example, many individual claims exist against a common fund, the fund is not large enough to satisfy the aggregate of the claims, and, therefore, class consideration is necessary to effectuate

a fair and equitable distribution of the fund, lessening the chance that subsequent claimants might be left without any relief. *See, generally, Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 833–41, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). No such fund exists in this case.