Matthew Cacace, Defendant.

No. 97–5846.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 5, 1998.

Decided Sept. 10, 1998.

**Carla D. FRIZZELL, Plaintiff–Appellant,**

v.

**SOUTHWEST MOTOR FREIGHT, Defendant–Appellee,**

Gary R. Patrick, (argued and briefed), Cara J. Alday, Patrick (briefed), Beard & Richardson, Chattanooga, TN, for Appellant.

Frank P. Pinchak (argued and briefed), Lisa M. Pate (briefed), Witt, Gaither & Whitaker, Chattanooga, TN, Leigh A. Battersby (briefed), U.S. Xpress, Inc., Chattanooga, TN, for Appellee.

Before: MERRITT, KENNEDY, and GILMAN, Circuit Judges.

## OPINION

KENNEDY, Circuit Judge.

Plaintiff Carla D. Frizzell appeals the District Court's judgment after a bench trial in favor of Defendant Southwest Motor Freight ("Southwest") on plaintiff's claims under the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. §§ 2601–2654, and the provisions of the Tennessee Human Rights Act (the "THRA"), TENN.CODE ANN. §§ 4–21–101 to –806 (1991), regarding maternity leave. We hold that the District Court erred in denying plaintiff a jury trial on her FMLA and THRA claims, and REVERSE and REMAND for a jury trial.

Plaintiff also appeals the District Court's grant of summary judgment for the defendant on plaintiff's gender discrimination claim under the THRA. We AFFIRM this grant of summary judgment because plaintiff failed to produce evidence of pretext or that Southwest treated her differently because of her gender.

### I. Right to a Jury

The District Court rejected Frizzell's jury demand and proceeded to conduct a bench trial on her FMLA and THRA

claims, entering judgment for defendant. Plaintiff appeals the rejection of her jury demand on both statutory construction and constitutional grounds. We first look to whether the FMLA requires a jury trial. *See Feltner v. Columbia Pictures Television, Inc.,* — U.S. —, —, 118 S.Ct. 1279, 1283, 140 L.Ed.2d 438 (1998) ("Before inquiring into the applicability of the Seventh Amendment, we must 'first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided.'") (quoting *Tull v. United States,* 481 U.S. 412, 417 n. 3, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) (alteration in original)). Because we hold that the FMLA provides a right to a jury trial, we do not reach the Seventh Amendment issue.

The FMLA does not expressly provide for the right to a jury trial. However, the structure of the remedial provisions of the FMLA, the reference in the FMLA's legislative history to the Fair Labor Standards Act (the "FLSA"), and other fragments of FMLA legislative history reveal Congress's intent to create a right to a jury trial in the FMLA. To date, three district courts have held that the FMLA includes the right to a jury trial. *See Bryant v. Delbar Prods., Inc.,* 1998 WL 546382, at *12–*13 (M.D.Tenn. Aug.27, 1998) (holding that the plaintiff is entitled to "a jury trial on the issues of back pay and liquidated damages, and this Court will decide the remaining equitable issues, such as reinstatement and front pay"); *Helmly v. Stone Container Corp.,* 957 F.Supp. 1274 (S.D.Ga.1997) (holding that the FMLA includes a right to a jury to determine liability and damages); *Souders v. Fleming Cos.,* 960 F.Supp. 218 (D.Neb.1997) (holding that the plaintiff is entitled to a jury trial to determine liability and back pay).

First, the structure of the FMLA's remedial provisions indicates that Congress intended to create a right to a jury. In the section describing the remedies available under the FMLA, Congress distinguishes between "damages" and "equitable relief":

(1) Liability

Any employer who violates section 2615 of this title shall be liable to any eligible employee affected—

(A) *for damages equal to—*

(i) the amount of—

(I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or

(II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks of wages or salary for the employee;

(ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and

(iii) an additional amount as liquidated damages equal to . . . ; and

(B) *for such equitable relief* as may be appropriate, including employment, reinstatement, and promotion.

(2) Right of action

*An action to recover the damages or equitable relief* prescribed in paragraph (1) may be maintained against any employer . . . .

29 U.S.C. § 2617 (emphasis added). The distinction between "damages" and "equitable relief" reflects Congress's intent to make juries available to plaintiffs pursuing remedies that fall under section 2617(1)(A), while leaving it to the judge to determine whether equitable relief is warranted under section 2617(1)(B). While Congress's intent would be clearer if the FMLA included the word "legal" to label the damages available under 2617(1)(A), *see Lorillard v. Pons,* 434 U.S. 575, 583, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), the FMLA's division between "damages" and "equitable relief" still indicates an intent to make juries available.

Second, the FMLA's legislative history link to the FLSA reveals Congress's intent to include a right to a jury in the FMLA. In *Lorillard,* the Court held that the Age Discrimination in Employment Act (the "ADEA") provides a statutory right to a jury trial. *See id.* at 580–81, 98 S.Ct. 866. The

*Lorillard* Court in part relied on the reference in the text of the ADEA to the remedial terms of the FLSA.[1] *See id.* Although the FLSA fails to provide expressly for a right to a jury, courts have "uniformly interpreted [the remedial provisions of the FLSA] to provide a right to a jury trial." *Feltner,* —— U.S. at ——, 118 S.Ct. at 1284 (citing *Lorillard,* 434 U.S. at 580–81, 98 S.Ct. 866). Thus, the *Lorillard* Court concluded that the ADEA's reference to the FLSA indicated that the ADEA includes a right to a jury trial. *See* 434 U.S. at 580–81, 98 S.Ct. 866. Because the legislative history of the FMLA reveals that Congress intended the remedial provisions of the FMLA to mirror those in the FLSA, we infer that Congress also intended to provide a right to a jury trial for claims of damages falling under section 2617(1)(A) of the FMLA. *See* S.Rep. No. 103–3, at 35 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 37 ("[The FMLA's] enforcement scheme is modeled on the enforcement scheme of the FLSA.... The relief provided in FMLA also parallels the provisions of the FLSA. Section 107 provides for injunctive and monetary relief for violations of the act."). The District Court relied in part on Title VII and ERISA case law to conclude that the remedy of back pay under the FMLA is equitable. Because the FMLA's link to the remedial provisions of the FLSA is stronger than it is to Title VII or ERISA, we rely on case law under the FLSA rather than Title VII or ERISA.

Third, other pieces of legislative history support our conclusion that Congress intended to include a right to a jury trial in the FMLA. During floor debates, a member of Congress opposed to the FMLA stated that under the FMLA, "[e]mployers will be subject to a Federal jury trial and possible damages." 139 Cong. Rec. H391 (daily ed. Feb. 3, 1993) (statement of Rep. Fawell); *see also id.* at H445 ("In the private sector and noncongressional public sector in this bill, the bill allows all covered employees to file a civil suit for damages, including a jury trial, for any of the myriad potential violations of the act...."). Those members of the House Committee on Education who opposed the FMLA also indicated that the FMLA provided for jury trials. *See* H.R.Rep. No. 103–8(I), at 72 (1993) (noting that "the enforcement structure of the bill has been simplified; however, it still retains the same two enforcement pillars [of an earlier version]—that is, DOL enforcement and private law suits, with jury trials").

Because the FMLA includes a right to a jury and plaintiff's request for damages is sufficient to trigger this statutory right to a jury trial, we hold that the plaintiff is entitled to a jury trial.

## II.  Gender Discrimination Claim

■ The plaintiff also appeals the grant of summary judgment in favor of Southwest on her gender discrimination claim under the THRA. The District Court granted summary judgment because "[e]ven assuming Frizzell has established a *prima facie* case, she has not presented evidence of pretext in response to Southwest's articulation of a legitimate, nondiscriminatory reason for hiring Shapiro [and] Frizzell has failed to show ... [that] Southwest's real motive for hiring Shapiro was gender discrimination." We affirm the grant of summary judgment because the plaintiff failed to produce evidence that rebutted Southwest's asserted reason or that showed Southwest treating Frizzell differently because of her gender.

We review a district court's grant of summary judgment de novo. *See Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view

---

1. To hold that the ADEA provided a statutory right to a jury, the *Lorillard* Court also relied on the ADEA's use of the word "legal" in the context of defining what relief was available under the ADEA. "We can infer, therefore, that by providing specifically for 'legal' relief, Congress knew the significance of the term 'legal,' and intended that there would be a jury trial on demand...." 434 U.S. at 583, 98 S.Ct. 866.

the facts and all inferences drawn from the facts in the light most favorable to the non-moving party. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When confronted with a properly-supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The facts viewed in the light most favorable to the plaintiff when summary judgment was granted reveal the following: Frizzell worked at Southwest from May 31, 1991 until August 15, 1994. She was the sole employee in Southwest's credit and collections department until she started training her temporary replacement in preparation for her maternity leave. In her work in the credit and collections department, Frizzell ran credit checks on customers, verified credit information, monitored accounts receivable, tracked delinquent payments, and collected delinquent payments. By all accounts, she performed well.

Within the limits of her job, Frizzell possessed considerable freedom and independence. Other employees, including some of the managers, referred to Frizzell as the manager of the credit and collections department. Some Southwest managers described Frizzell to customers as the manager of the credit and collection department. Southwest allowed Frizzell to refer to herself as manager and she signed some correspondence as manager of the department. However, Southwest management considered Frizzell to be a clerk rather than an official manager.

Frizzell started dating Matt Cacace, a vice-president at Southwest, in early 1993. Cacace worked in a supervisory capacity with respect to Frizzell. In late 1993, Frizzell became pregnant with Cacace's child. Frizzell moved into the home of Cacace in November 1993. In the Spring of 1994, Frizzell notified Southwest of her desire to take maternity leave. Southwest granted the leave, which commenced on June 24, 1994, the date Frizzell gave birth to her and Cacace's child. Cacace and Frizzell's romantic relationship deteriorated from the beginning of her pregnancy until the birth of her child.

In anticipation of Frizzell's maternity leave, Southwest hired Mark Shapiro to fill in temporarily for Frizzell during her maternity leave. Shapiro's resume listed a master's degree in business administration and extensive business experience in financial matters, budgeting, and credit. Frizzell trained Shapiro on the computer and business systems used by Southwest and introduced Shapiro to Southwest's method of operations. At this time, Don Rutledge, comptroller of Southwest's parent company and general manager of Southwest and a sister company, held supervisory responsibilities for the credit and collection function at Southwest.

During this period of training, plaintiff asserts that Shapiro commented on and questioned her about her marital status, her pregnancy, the paternity of her child, and her religion in a manner that disturbed Frizzell. Additionally, Frizzell noticed that Shapiro would leave work for unauthorized periods but claim this time for pay purposes. Frizzell reported both Shapiro's comments and her suspicions concerning his work hours to appropriate Southwest officials. Southwest responded by counseling Shapiro and more closely monitoring his work hours.

While Frizzell was on maternity leave, Rutledge received new responsibilities overseeing construction projects resulting from the growth of Southwest's parent company. Because these responsibilities would require Rutledge's absence from the area, Southwest decided to create a new position to relieve Rutledge of his role in supervising the credit and collection function at both Southwest and its sister company. Cacace played no role in this decision. The title of the new position was manager of credit and collections. Southwest offered the position to Shapiro, who accepted and assumed the position effective August 15, 1994.

Frizzell returned to Southwest from her maternity leave on August 8, 1994. Southwest informed Frizzell that Shapiro would

assume the position of manager of credit and collections and she would report to Shapiro. When she returned to work, Frizzell performed essentially the same duties she had performed prior to her leave. She received a pay increase either just before she went on leave or during her leave. However, with Shapiro assuming the official position of credit manager, Frizzell no longer was able to refer to herself with that title and her co-workers would no longer refer to her with that title. Some of her co-workers perceived Shapiro as replacing Frizzell as manager of the credit and collection department. Frizzell would also have to seek Shapiro's approval in day-to-day matters instead of having face-to-face contact with top officials at Southwest. The appointment of Shapiro as manager restricted her freedom of interaction and reduced some of the prestige and status she had previously enjoyed.

Frizzell expressed her concerns and displeasure with Shapiro's appointment to Cacace, Rutledge, and Patrick E. Quinn, one of the owners of Southwest's parent company and vice-president. According to Frizzell, all three Southwest officials told Frizzell to "accept it or quit." These Southwest officials told Frizzell that Southwest would not change the decision to name Shapiro manager of credit and collections at this time. According to Frizzell, Cacace sent her a message on her computer that said "I'm a bimbo" when she returned from her maternity leave.

During the week of August 8, 1994 to August 12, 1994, Shapiro spent much of his time at Southwest's sister company filling in for a departing employee. On the night of August 12, 1994, Frizzell telephoned Rutledge and the office manager, Sandra Wood, and asked to take two weeks of annual leave starting on Monday, August 15, 1994. They refused her request. In her telephone conversation with Rutledge, Frizzell mentioned that she wanted to transfer to another posi-

tion where she would not have to report to Shapiro. She had previously discussed that possibility with Cacace and Rutledge. On that Friday, Rutledge responded that he did not know of any available positions but she could go through the proper channels and talk to Sandra Wood about a transfer.

Over the weekend of August 13–14, 1994, Frizzell prepared a resignation from Southwest. She discussed this decision with Cacace and prepared her letter of resignation with his assistance. In her letter, Frizzell stated that she was resigning in order to return to school full time. This reason was untrue because she had no intention to return to school and no money to pay for it. Southwest received Frizzell's letter of resignation on Monday, August 15, 1994. She claims that the conditions of her employment under Shapiro amount to a constructive discharge.

The THRA, like Title VII of the Civil Rights Act of 1964, prohibits gender discrimination:

> It is a discriminatory practice for an employer to:
> (1) Fail or refuse to hire or discharge any person or otherwise discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's ... sex....

TENN.CODE ANN. § 4–21–401(a)(1) (1991). The Tennessee Supreme Court has held that courts may use federal case law assessing claims under Title VII to analyze THRA claims. *See Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn.1996).

We, like the District Court, assume that plaintiff established a prima facie case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[2] Once the plaintiff has established a prima facie case, a burden of production shifts to the defendant to produce a

---

**2.** A plaintiff can establish a prima facie case by showing that: (1) plaintiff was a member of a protected class; (2) plaintiff suffered an adverse employment action; (3) plaintiff was qualified for the position; and (4) plaintiff was replaced by a person outside the protected class. *See, e.g., Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th

Cir.1992). Plaintiff points to her constructive discharge as the requisite adverse employment action. We need not reach the issue of whether plaintiff was constructively discharged because we assume that the plaintiff has established a prima facie case.

legitimate, non-discriminatory reason for the employment action. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden of persuasion always rests with the plaintiff. *See id.* at 507, 113 S.Ct. 2742; *Hartsel,* 87 F.3d at 800 ("Once the prima facie case is made, a defendant may offer any legitimate, non-discriminatory reason for the employment action, which the plaintiff may rebut by evidence of pretext; however, the burden of proof always remains with the plaintiff."). That means in this case the plaintiff must prove that she was constructively discharged because of her gender. The defendant here established a "legitimate, non-discriminatory reason" for hiring Shapiro: Southwest created a new mid-level management position because of the company's growth and selected Shapiro for the position because of his education and work experience reflected in his resume.[3]

■ One way that the plaintiff can rebut the defendant's legitimate, non-discriminatory reason and avoid summary judgment is by showing that the defendant's reason has no basis in fact, the reason did not actually motivate the adverse employment action, or the reason was insufficient to motivate the adverse employment action. *See Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994). If the plaintiff produces evidence rebutting the defendant's stated reason, then the factfinder is permitted to infer discrimination and summary judgment in favor of the defendant is inappropriate. *See Hicks,* 509 U.S. at 511, 113 S.Ct. 2742; *Kline v. Tennessee Valley Auth.,* 128 F.3d 337, 347 (6th Cir.1997); *EEOC v. Yenkin–Majestic Paint Corp.,* 112 F.3d 831, 835 (6th Cir.1997). Plaintiff here fails to rebut this justification with any evidence that Southwest did not need the position due to growth or that Southwest selected Shapiro for reasons other than the superior education and work experience reported on his resume.

■ The plaintiff can also avoid summary judgment by producing evidence that the defendant treated the plaintiff worse because of her gender, that is, evidence that tends to establish intentional discrimination. *See, e.g., Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Frizzell points to no evidence indicating that Southwest treated her differently because of her gender, such as evidence that Southwest placed Shapiro in a position above her because of her gender, that Southwest treated transfer requests from men more favorably, or that Southwest would have granted an immediate vacation request to a man just returning from leave.[4]

Because Frizzell has failed to produce any evidence rebutting the defendant's stated reason or indicating that she was treated differently because of her gender, we affirm the District Court's grant of summary judgment on Frizzell's THRA gender discrimination claim.

### III. Conclusion

For the proceeding reasons, we RE-VERSE and REMAND for a jury trial on plaintiff's FMLA and remaining THRA claims. We AFFIRM the grant of summary judgment for the defendant on the plaintiff's gender discrimination claim under the THRA.

---

**3.** While Frizzell's unfavorable view of Shapiro turned out to be accurate and Southwest fired Shapiro for writing bad checks and other misconduct on November 11, 1994, Southwest attained knowledge of these facts after plaintiff's employment ended.

**4.** Plaintiff does not argue from *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), that her evidence establishes that gender directly played a role in her constructive discharge.