RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0055p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DAVID BLEDSOE; GARY PLASTER; RICK
BRIDGES; DAVID UNGEMACH; STEVEN E.
DOLSKI,

            *Plaintiffs-Appellants,*

    *v.*

EMERY WORLDWIDE AIRLINES, INC.; CNF
CORPORATION,

            *Defendants-Appellees.*

No. 09-4346

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 02-00069—Walter H. Rice, District Judge.

Argued: January 20, 2011

Decided and Filed: February 16, 2011

Before: GUY, BOGGS, and GIBBONS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David G. Torchia, TOBIAS, KRAUS & TORCHIA, Cincinnati, Ohio, for
Appellants. Thomas H. Barnard, Jr., OGLETREE DEAKINS NASH SMOAK &
STEWART, P.C., Cleveland, Ohio, for Appellees. **ON BRIEF:** David G. Torchia,
TOBIAS, KRAUS & TORCHIA, Cincinnati, Ohio, for Appellants. Thomas H. Barnard,
Jr., Michelle R. Arendt, OGLETREE DEAKINS NASH SMOAK & STEWART, P.C.,
Cleveland, Ohio, for Appellees.

_____

## OPINION

_____

    RALPH B. GUY, JR., Circuit Judge. Plaintiffs, representing a class of former
employees of Emery Worldwide Airlines, Inc. (EWA), appeal from the entry of

judgment in favor of defendants EWA and its parent company CNF Corporation on claims brought under the Worker Adjustment and Retraining Notification Act of 1988 (WARN Act), 29 U.S.C. §§ 2101-2109. Plaintiffs' principal claim is that the district court erred in finding, at the conclusion of a four-day bench trial, that plaintiffs were not entitled to notice under the WARN Act because they had no "reasonable expectation of recall" from layoff at the time that EWA permanently ceased operations. Plaintiffs also urge us to reverse the district court's determination that there is no right to a jury trial for employee claims brought under the WARN Act. Lastly, plaintiffs challenge the district court's pretrial decision excluding from the class the laid-off employees of two nearby EWA facilities because those facilities could not be viewed as part of a "single site of employment" with EWA's Hub. After review of the record and consideration of the arguments presented on appeal, we affirm.[1]

## I.

EWA, a wholly owned subsidiary of CNF, operated as a commercial air freight carrier primarily from its "Hub" facility at the Dayton International Airport in Vandalia, Ohio.[2] Operating under a Federal Aviation Administration (FAA) certificate, EWA came under greater oversight following inspections in late 1999 and in the wake of a fatal accident involving an EWA plane in February 2000. The district court's written findings of fact outline the communications between the FAA and EWA beginning in early 2001, including: the serious possibility that EWA could lose its flight certificate; the actions taken by EWA to address safety issues through the spring and into the summer of 2001; and the events that followed EWA's suspension of flight operations at the insistence of the FAA in August 2001.

It was the grounding of EWA's planes in August 2001 that resulted in the temporary layoff of approximately 575 EWA employees, including flight crew members,

---

[1]At oral argument, plaintiffs' counsel confirmed our view that affirmance with respect to the first two issues would render the last issue moot. As a result, we do not reach the question of whether EWA's nearby Hangar A or Webster Street facilities constituted a "single site of employment" with EWA's Hub.

[2]CNF, now known as Con-Way, Inc., is a publicly traded holding company with more than 20 subsidiaries.

between August 13 and 15, 2001. The first letters EWA sent to the laid-off employees anticipated that, if EWA was able to resolve issues with the FAA, the layoffs should last less than six months. Although EWA entered into a final settlement agreement with the FAA on September 18, 2001, the FAA imposed numerous additional requirements on EWA during a subsequent meeting on September 27, 2001. The district court found that these "increases in requirements were tantamount to requiring EWA to complete certification as if it were a new carrier entering the market." *Bledsoe v. Emery Worldwide Airlines, Inc.*, No. 3:02cv069, 2009 WL 3127740, at *3 (S.D. Ohio Sept. 28, 2009) (unpublished). EWA protested to the FAA that the additional requirements were significantly beyond the scope of their settlement, to no avail. As will be discussed more fully below, letters updating the laid-off employees about the situation were sent in both early October and early November 2001.

Despite continued efforts to address FAA concerns, EWA's management ultimately concluded that it would not succeed in getting FAA approval to resume operations in a timely manner. On December 4, 2001, CNF decided to permanently close EWA "based on the economic considerations of getting the company back in operating status and because of the continuing uncertainty associated with the FAA authorizing EWA's future flight operations." *Id*. at *4. The next day, December 5, 2001, EWA notified the roughly 90 remaining active employees of a 60-day layoff, with pay, pending their termination effective February 6, 2002. The previously laid-off employees, on the other hand, were notified that their layoffs were permanent without affording them advance notice or pay in lieu thereof.

The named plaintiffs, David Bledsoe, Gary Plaster, Rick Bridges, David Ungemach, and Steven Dolski, filed this action in February 2002, asserting violations of the WARN Act on behalf of themselves and other laid-off employees. In March 2003, the district court conditionally certified a class of plaintiffs consisting of:

> All persons, of about 575 in number, who were employed by [EWA] at its Vandalia, Ohio facility as of August 13, 2001; who were notified by [EWA] between August 13 and 15, 2001, of their subsequent layoffs; who were notified by [EWA] on December 5, 2001, that their layoffs

were permanent; and who did not receive 60 days' notice or 60 days' pay in lieu thereof for the mass layoff that began on August 14, 2001, and which was deemed permanent on December 5, 2001.

*Bledsoe v. Emery Worldwide Airlines, Inc.*, 258 F. Supp. 2d 780, 803 (S.D. Ohio 2003). The certification was conditioned on a later determination as to the precise scope of the class, including the district court's determination that the employees of EWA's separate Hangar A and Webster Street facilities should not be included in the class.

With the class defined, and having granted the defendants' motion to strike the plaintiffs' jury demand, *see Bledsoe*, 258 F. Supp. 2d at 788-99, the district court conducted a bench trial and issued its written decision setting forth its findings of facts and conclusions of law. Notably, the district court found, as plaintiffs had conceded at trial, that the layoffs in August 2001 did not constitute an employment loss upon which the WARN Act claims could be predicated. Then, finding that the plaintiffs no longer had "reasonable expectation of recall" at the time of the closure in December 2001, the district court concluded that plaintiffs were not "affected employees" entitled to notice under the WARN Act. Without reaching other contested issues, the district court concluded that neither EWA nor CNF could be liable to plaintiffs under the WARN Act. Judgment was entered accordingly, and this appeal followed.[3]

## II.

The WARN Act, with some exceptions not at issue here, forbids an employer of 100 or more full-time employees to "order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order." 29 U.S.C. § 2102(a). The notice requirement depends on there being a sufficiently large plant closing or mass layoff at a "single site of employment," *id.* at § 2101(a)(1)-(3), and the employer must notify, among others, "each affected employee," *id.* at § 2102(a)(1). An employer who fails to give the required notice, or pay in lieu thereof, may be liable for

---

[3]A layoff of more than six months that, at its outset, was announced to be a layoff of six months or less is treated as an "employment loss" unless "(1) the extension beyond 6 months is caused by business circumstances . . . not reasonably foreseeable at the time of the initial layoff; and (2) notice is given at the time it becomes reasonably foreseeable that the extension beyond 6 months will be required." 29 U.S.C. § 2102(c).

civil penalties to the local government and for specified damages to affected employees. *Id.* at § 2104.[4]

## A.    Jury Demand

Whether there is a right to a trial by jury in an action seeking to enforce liability for back pay and benefits under the WARN Act is a question squarely addressed by only a few district courts, which have applied the same general principles but reached divergent conclusions. *Compare Bentley v. Arlee Home Fashions, Inc.*, 861 F. Supp. 65 (E.D. Ark. 1994) (finding a right to jury trial), *with Bledsoe*, 258 F. Supp. 2d at 788-99 (finding no right to jury trial), *and Loehrer v. McDonnell Douglas Corp.*, No. 91-1747, 1992 U.S. Dist. LEXIS 22555 (E.D. Mo. Oct. 5, 1992) (same).  For the reasons that follow, we agree with the district court in this case and affirm.[5]

The Seventh Amendment of the United States Constitution provides that "[i]n Suits at common law, . . . the right of trial by jury shall be preserved."  U.S. CONST. amend. VII.  The Supreme Court has explained that the phrase "suits at common law" means "'not merely suits, which the common law recognized among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'"  *Curtis v. Loether*, 415 U.S. 189, 193 (1974) (citation omitted).  Dispelling any lingering doubts about its application to statutory causes of action, the Court in *Curtis* held that:  "The Seventh Amendment does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates

---

[4]A "plant closing" is "the permanent or temporary shutdown of a single site of employment . . . if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees[]."  *Id.* at §  2101(a)(2).  A "mass layoff" is "a reduction in force which (A) is not the result of a plant closing; and (B) results in an employment loss at the single site of employment during any 30-day period for–(i)(I) at least 33 percent of the employees []; and (II) at least 50 employees[]; or (ii) at least 500 employees []."  *Id.* at § 2101(a)(3).

[5]Plaintiffs emphasize that two other circuits have affirmed jury verdicts in WARN Act cases, but acknowledge that in neither case was the court asked to consider whether there was a right to jury trial. *See Hollowell v. Orleans Reg'l Hosp.*, 217 F.3d 379 (5th Cir. 2000); *Local Union No. 1992 IBEW v. The Okonite Co.*, 358 F.3d 278 (3d Cir. 2004).

legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Id*. at 194.

At the outset, we find that the WARN Act may not be construed to avoid the constitutional question entirely. *Curtis*, 415 U.S. at 192 n.6 (recognizing "the 'cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the (constitutional) question may be avoided'"); *see also Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565 n.3 (1990). The WARN Act neither speaks directly to the question of whether there is a right to jury trial nor otherwise makes clear an intention in this regard. *Cf. Lorillard v. Pons*, 434 U.S. 575, 583 (1978) (finding a statutory right to jury trial on claims for lost wages and benefits under the ADEA). Nor does the legislative history traced by the district court, *Bledsoe*, 258 F. Supp. 2d at 790 n.5, reveal clear legislative intent on the issue.[6]

The question under the Seventh Amendment is whether an action under the WARN Act by or on behalf of an aggrieved employee resolves legal rights. That determination requires examination of the nature of the issues involved and the remedy sought. *Wooddell v. Int'l Bhd. of Elec. Wkrs., Local 71*, 502 U.S. 93, 97 (1991); *Terry*, 494 U.S. at 565. To do this, we (1) "'compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity,'" and (2) "'examine the remedy sought and determine whether it is legal or equitable in nature.'" *Id.* (quoting *Tull v. United States*, 481 U.S. 412, 417-18 (1987)).

---

[6]An arguably relevant reference in the legislative history, which the *Bentley* court considered to be relevant but not authoritative in finding a right to jury trial, involved comments made during the debates by Senator Orrin Hatch. Senator Hatch expressed opposition to the WARN Act on numerous grounds, including his concern that the WARN Act would create legal rights for which the Seventh Amendment would preserve a right to jury trial. *Bentley*, 861 F. Supp. at 66-67 (quoting Sen. Hatch); *see also Bledsoe*, 258 F. Supp. 2d at 791 (same). As the court in *Bentley* acknowledged, however, "'[t]he fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to when the meaning of the statutory word is in doubt.'" *Bentley*, 861 F. Supp. at 67 (quoting *NLRB v. Fruit and Vegetable Packers and Warehousemen, Local 760*, 377 U.S. 58 (1964)). Although this concern was unanswered, defendants identified a comment in the Senate Report of a predecessor bill, "which suggests that the damages provision under the Act 'is in effect a liquidated damages provision[], designed to penalize the wrongdoing employer, deter future violations, and facilitate simplified damages proceedings.'" *Bledsoe*, 258 F. Supp. 2d at 790 (quoting S. Rep. No. 100-62, p. 24). The Senate Report also stated that the discretion of the court to reduce the amount of damages under § 2104(a)(4), was "modeled after section 11 of the Portal-to-Portal Act, 29 U.S.C. [§] 260 and is to be interpreted in accordance with the prevailing law under that section." *Id.* (quoting S. Rep. No. 100-62, p. 25). While the structure of the remedial provision is relevant to our analysis, the district court found this Senate Report had little persuasive value given that it was not submitted with the bill that was actually passed.

"The second inquiry is the more important in our analysis." *Id*. (citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989)).

It is undisputed that no action for failing to give advance notice of an employment loss was known to 18th-century England. *But cf. Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348 (1998) (finding comparable 17th-century action at law for copyright infringement). Also, like the district court, we do not see an analogy between the issue to be tried in an employee's WARN Act claim and an action for breach of contract—a recognized pre-merger action at law—as was suggested by the district court in *Bentley*. *Cf. Terry*, 494 U.S. at 569-70 (finding analogy to contract action in a Labor Management Relations Act § 301 action for breach of duty of fair representation under a collective bargaining agreement). Nor are the WARN Act claims analogous to a personal injury or tort action, which would be "a prototypical example of an action at law." *Wooddell*, 502 U.S. at 98. Instead, as the district court suggested, a better comparison might be to a breach of an employer's fiduciary duty, which is an action recognized as equitable in nature. *Bledsoe*, 258 F. Supp. 2d at 793 (citing cases).[7]

This brings us to the second and more important question of whether the remedy is legal or equitable in nature. The WARN Act's civil enforcement section provides, in pertinent part, that an employer who orders a plant closing or mass layoff in violation of the notice requirements:

> shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for—
>
> (A) back pay for each day of violation at a rate of compensation not less than the higher of—

---

[7] Our determination that the issue to be tried is not analogous to a breach of contract is not altered by plaintiffs' reliance on two cases in which the courts decided to apply a borrowed state-law limitations period for contract actions to the WARN Act claims at issue. *See Aaron v. Brown Group, Inc.*, 80 F.3d 1220, 1225-26 (8th Cir. 1996); *Frymire v. Ampex Corp.*, 61 F.3d 757, 764 (10th Cir. 1995); *see also Staudt v. Glastron, Inc.*, 92 F.3d 312, 316 (5th Cir. 1996) (noting that WARN Act not particularly analogous to contract claims). Indeed, despite plaintiffs' assertion to the contrary, the Supreme Court did not identify which state-law statute of limitations would be most appropriate for a WARN Act claim in *North Star Steel Co. v. Thomas*, 515 U.S. 29, 35-36 (1995) (holding only that the limitations period for WARN Act claims should be borrowed from state, not federal, law).

> (i) the average regular rate received by such employee during the last 3 years of the employee's employment; or
>
> (ii) the final regular rate received by such employee; and
>
> (B) benefits under an employee benefit plan [under ERISA], including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred.

29 U.S.C. § 2104(a)(1). This liability to an aggrieved employee is expressly limited to "the period of the violation, up to a maximum of 60 days, but in no event for more than one-half the number of days the employee was employed by the employer." *Id*. In addition, the liability is offset by "(A) any wages paid by the employer to the employee for the period of the violation" (i.e., in lieu of notice); "(B) any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation"; or "(C) any payment by the employer to a third party or trustee . . . on behalf of and attributable to the employee for the period of the violation." *Id.* at 2104(a)(2). Similarly, any liability with respect to a defined benefit pension plan "may be reduced by crediting the employee with service for all purposes under such a plan for the period of the violation." *Id*.

Finally, Congress granted the district court the discretion to further reduce the amount of such liability by providing that:

> If an employer which has violated this chapter *proves to the satisfaction of the court* that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter *the court may, in its discretion, reduce the amount of the liability or penalty* provided for in this section.

*Id.* at § 2104(a)(4) (emphasis added). Significantly, this places the entire damage award—the liability for back pay and benefits—within the district court's discretion. The WARN Act expressly provides that the specified remedies are exclusive, adding that the court shall not have authority to enjoin a plant closing or mass layoff. *Id.* at § 2104(b); *see also id*. at § 2104(a)(6) (authorizing attorney fees to prevailing party).

Without describing the relief as either legal or equitable, the statute authorizes suit in federal court to enforce this liability. *Id*. at § 2104(a)(5).[8]

Although "an action for money damages was 'the traditional form of relief offered in the courts of law,'" an award of monetary relief is not necessarily legal in nature. *Terry*, 494 U.S. at 570 (quoting *Curtis*, 415 U.S. at 196). In particular, money damages have been characterized as equitable when analogous to equitable restitutionary relief, or when incidental to or intertwined with injunctive relief. *Id*. at 570-71; *Wooddell*, 502 U.S. at 97. We are persuaded that the statutory remedies available to aggrieved employees provide equitable restitutionary relief for which there is no constitutional right to a jury trial.

First, the exclusive remedies are tailored to restoring the pay and benefits that the employer should have provided to its aggrieved employees during or in lieu of a 60-day notice period. This is restitutionary in nature, and is not compensation for discriminatory or otherwise wrongful termination or layoff. This distinguishes the WARN Act from a claim for back pay in an LMRA § 301 action for breach of the duty of fair representation, which has been held to be legal in nature. *See Terry*, 494 U.S. at 570-71 (explaining that back pay damages did not represent money wrongfully withheld by the union, but rather wages and benefits that would have been received if the union had processed the grievances properly). Here, as the district court explained:

> what the Plaintiffs herein are seeking is not compensation for the damages flowing from their discharge, but a reimbursement of those salaries and benefits, calculated on a per diem basis, which were due to them on the date they were laid off, in lieu of [EWA]'s having given them proper notice of their layoffs, and which have to this point in time been wrongly withheld from them.

*Bledsoe*, 258 F. Supp. 2d at 798. The analogy to wrongfully withheld funds—here back pay and benefits that should have been paid—is an apt one. Significantly, no additional

---

[8]Distinct from the liability to aggrieved employees, an employer who fails to provide the required notice to a governmental unit is subject to civil penalties of not more than $500 for each day of violation, unless the employer pays each aggrieved employee the amount due within three weeks of when the employer ordered the shutdown or layoff. *Id*. at § 2104(a)(3). Such penalties are not at issue in this case.

or alternative damages are provided for, and liability is limited to the number of days of violation and offset by other payments to or on behalf of the employee. *Cf. Schwartz v. Gregori*, 45 F.3d 1017, 1022-23 (6th Cir. 1995) (holding back pay awarded for retaliatory discharge in violation of § 510 of ERISA constituted restitution and was, therefore, an equitable remedy available under ERISA).

Second, as noted, the WARN Act places the entire amount of the liability in the district court's discretion. This reinforces our view that the WARN Act remedies at issue are equitable in nature. Back pay under Title VII has been characterized by the courts of appeals as an equitable remedy for which there is no right to a jury trial, and the Supreme Court has assumed as much without deciding the issue. *Curtis*, 415 U.S. at 197; *see EEOC v. Detroit Edison Co.*, 515 F.2d 301, 308 (6th Cir. 1975) ("Back pay in Title VII cases is considered a form of restitution, not an award of damages."), *vacated on other grounds*, 431 U.S. 951 (1977).[9] In distinguishing Title VII from other statutes under which there is a right to a jury trial, the Supreme Court emphasized (1) that back pay is specifically included with other equitable relief under Title VII, and (2) that the award of back pay is a matter within the court's equitable discretion under Title VII. *See Lorillard*, 434 U.S. at 583-84; *Curtis*, 415 U.S. at 197. The distinction between mandatory and discretionary remedies was described by then Justice Rehnquist in a concurring opinion as follows:

> To the extent, then, that the District Court retains substantial discretion as to whether or not to award backpay notwithstanding a finding of discrimination, the nature of the jurisdiction which the court exercises is equitable, and under our cases neither party may demand a jury trial. To the extent that discretion is replaced by awards which follow as a matter of course from a finding of wrongdoing, the action of the court in making such awards could not be fairly characterized as equitable in character, and would quite arguably be subject to the provisions of the Seventh Amendment.

---

[9]Prior to the Civil Rights Act of 1991, only equitable relief, including back pay, was available to prevailing plaintiffs under Title VII. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 533-34 (1999). The 1991 Act expanded the remedies available in cases of intentional discrimination to include compensatory and punitive damages and authorized a trial by jury for those claims. *See* 42 U.S.C. § 1981a(a)(1), (c)(1) (1991); *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 852 (2001).

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 443 (1975) (Rehnquist, J., concurring). This guidance held particular sway with the district court in *Loehrer*, which observed that although the WARN Act appears to provide for an award of liability as a matter of course, in fact, the district court has discretion to reduce the amount of that liability. *See also Cain v. Inacom Corp.*, No. 00-1724, 2001 WL 1819997, at \*1 (Bankr. D. Del. Sept. 26, 2001) (following *Loehrer* and not *Bentley* in concluding that employees' WARN Act remedies are equitable in nature and, therefore, properly brought in an adversary proceeding).

Finally, we are not persuaded that the WARN Act is akin to the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2617, which we recognized as providing a right to a jury trial on claims for damages in *Frizzell v. Southwest Motor Freight*, 154 F.3d 641, 643-45 (6th Cir. 1998). In fact, we found a statutory right to jury trial under the FMLA and did not reach the Seventh Amendment issue at all.

Our holding in *Frizzell* rested heavily on the structure of the FMLA, which provides separately for "damages" in § 2617(a)(1)(A) and for "such equitable relief as may be appropriate" in § 2617(a)(1)(B). We held that, as the Supreme Court found with respect to the ADEA in *Lorillard*, this indicated Congress's intent to make juries available to plaintiffs pursuing money damages under the FMLA while leaving it to the court to decide whether equitable relief is warranted. *Frizzell*, 154 F.3d at 643. Also, again as was the case in *Lorillard*, we found an intention to allow jury trials from the fact that Congress modeled the FMLA's enforcement provisions on the Fair Labor Standards Act (FLSA)—a statute that had been uniformly interpreted to provide a right to jury trial. *Id*. at 643-44. Neither is the case with respect to the WARN Act. Moreover, although the FMLA gives the court discretion to reduce an employer's liability, that discretion extends only to the liquidated damages portion of the liability. 29 U.S.C. § 2617(a)(1)(A)(iii). *See McClanahan v. Mathews*, 440 F.2d 320, 322 (6th Cir. 1971) (commenting that since an award of liquidated damages [under the FLSA] is left to the

'sound discretion' of the court, it is to be granted, or denied, by the court, as opposed to the jury").[10]

Finding that the district court did not err in striking the plaintiffs' jury demand, we turn to plaintiffs' principal claim on appeal.

**B.     Reasonable Expectation of Recall**

The dispositive issue at trial was whether the plaintiffs were "affected employees" to whom notice was required at the time EWA permanently ceased operations. On appeal from a judgment on the merits following a bench trial, we review the factual findings for clear error and the conclusions of law *de novo*. FED. R. CIV. P. 52(a)(6); *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985).

**1.     Facts**

The district court's findings, which plaintiffs do not challenge on appeal, summarize the facts leading up to the suspension of flight operations as follows:

> As early as 1999, EWA employees were in communication with EWA/CNF and the FAA about safety and maintenance concerns with the company. In February 2000, there was a fatal accident involving an EWA plane, which led to increased oversight of the airline by the FAA. The FAA conducted periodic safety inspections of EWA. The number of potential violations of FAA regulations increased from 4, in early 2000, to 43 by the end of that year.
>
> In early 2001, EWA's Vice President of Safety wrote a memorandum to its CEO, Jerry Trimarco, stating that EWA had an "above average risk of a maintenance related major or minor mishap and certificate action by the FAA" and strongly recommended that EWA/CNF commit the resources necessary to address the problem. By late January 2001, EWA's Assistant Vice President of Safety indicated that it was his belief that EWA was in "serious jeopardy" of losing its FAA certificate.

----

[10]Satisfied that the Seventh Amendment does not preserve a right to a jury trial for claims of aggrieved employees under the WARN Act, it is not necessary to decide whether this conclusion would be further supported by the fact that the WARN Act limits the recovery of lost benefits to those described under ERISA.

In February 2001, Trimarco and other EWA management members met with representatives of the FAA to inform the FAA of the steps EWA had taken to comply with FAA regulations and to discuss the status of EWA's flight certificate. At that meeting, the FAA indicated that the withdrawal of EWA's certificate was "not off the table." In April 2001, there was an incident involving an EWA plane with landing gear that failed to engage. This incident generated more employee concerns regarding safety issues, and, on behalf of the company, concerns regarding the FAA taking action on its certificate.

. . . .

In the spring and summer months of 2001, EWA took several steps to attempt to address its safety and maintenance problems, including following through on a Plan of Action and Milestones, developed in accordance with FAA direction, committing to a multimillion dollar project to digitize the airline's maintenance manuals, and initiating a quarantine program in order to revitalize deficient aircraft. EWA also hired a team of consultants to oversee operations and to ensure that the airline was making steady progress on resolving its safety issues.

On August 10, 2001, Trimarco received a call from the FAA, advising him of a meeting the following day and that he should have counsel present. During that meeting, the FAA informed Trimarco that it would take action against EWA's certificate, if EWA did not voluntarily ground its planes, based on EWA's numerous, apparent violations of Federal Aviation Regulations. Determining that it had no other choice, EWA/CNF management decided to ground EWA's fleet. On August 13, 2001, EWA signed an interim agreement with the FAA, which provided that EWA would temporarily ground its planes, in lieu of the FAA pursuing action on EWA's flight certificate.

*Bledsoe*, 2009 WL 3127740, at \*1-2 (citations to record omitted). CNF released an employee bulletin stating that EWA was working to resolve the issues and that another fleet of aircraft would temporarily take over flying the freight of the customers of EWA's sister company. Service to customers was not disrupted, but it added to the cost of grounding EWA's planes.

Three sets of letters were sent to employees concerning the layoffs. The first set of letters, sent August 24, 2001, provided in relevant part:

> At the present time, it is anticipated that, if we are able to resolve issues with the [FAA], the furlough of all flight crew members should last less than six (6) months, although it is impossible to determine that with any certainty. We will notify you if there is any change in the duration or status of the furlough.

and

> Although it is impossible to determine this with any certainty, at this time we currently anticipate that, if we are able to resolve issues with the [FAA], employees should be recalled to work in less than six (6) months, hopefully even bringing employees back to work within sixty (60) days of their being laid off. Employees will be called back to work as soon as the need for each position arises.

On September 18, 2001, EWA and the FAA entered into a final settlement agreement, which provided, among other things, that EWA would pay $1 million in fines in several installments, and that both parties would use their best efforts to resolve the issues on an expedited basis.

At a meeting on September 27, 2001, however, the FAA imposed numerous additional requirements that EWA would be expected to meet before flight operations could be resumed. As noted earlier, the district court found the "increases in requirements were tantamount to requiring EWA to complete certification as if it were a new carrier entering the market." *Bledsoe*, 2009 WL 3127740, at *3. A second set of letters to employees followed on October 5 and 8, 2001, which referenced the settlement agreement, but advised that it was "impossible to determine with any certainty the timeline for resolving issues with the FAA." One of the October letters added that: "Although initially we had hoped to be able to recall employees within the sixty (60) day time frame, unfortunately at this time we have no plans to recall any furloughed employee. Employees will be called back to work as soon as the need for each position arises."[11]

---

[11]The October 2001 letters also advised that employee benefits provided during the first 60 days would cease, and information would be made available regarding the continuation of benefits under COBRA. Plaintiffs downplay this evidence, arguing that a layoff may be a qualifying event under COBRA. *See Local 217, Hotel & Rest. Emps. Union v. MHM*, 976 F.2d 805, 809 (2d Cir. 1992). The district court did not consider this advice because the rest of the evidence established that there was no

On October 9, 2001, within days of the second set of letters to laid-off employees, EWA wrote to the FAA to strenuously protest the additional requirements as significantly beyond the scope of the project that had been outlined earlier. EWA continued to work with the FAA, while also having internal discussions about the future of the company. The FAA would not retreat from the additional requirements, however.

Reflecting the significant change in circumstances, the third set of letters to employees concerning the layoffs dated November 5, 2001, stated in relevant part:

> As I indicated to you in my prior correspondence, we initially anticipated that the layoffs would last less than six (6) months and that the company could resume flight operations. While we have made progress toward resolving the issues that resulted in the grounding of the airline, the implementation of the agreement with the FAA and the resumption of flight operations will require a much greater expenditure of time and money than we originally believed, therefore, it is now estimated that the layoffs will last longer than six (6) months. It has not yet been determined whether the layoffs will be permanent or temporary. It is now projected that flight operations will not be resumed before April 1, 2002, and then only if the necessary funding can be secured and approved.

Both letters stated: "For these reasons, your layoff [or furlough] will continue until *at least* April 1, 2002." (Emphasis added.) At a meeting between EWA management and FAA officials on November 7, EWA expressed concerns about the timeline for resolving the issues, confusion about what precisely was being required, and a need to determine the costs of going forward. At the end of November 2001, EWA finally concluded that it would not receive the support it needed from the FAA in order to be able to resume flight operations in a timely manner. On December 4, 2001, CNF decided to permanently cease operations "based on the economic considerations of getting the company back in operating status and because of the continuing uncertainty associated with the FAA authorizing EWA's future flight operations." *Bledsoe*, 2009 WL at 3127740, at * 4.

---

reasonable expectation of recall. Since its significance remains unclear, we likewise do not decide whether it would add further support to the district court's determination in this case.

### 2.    Analysis

The WARN Act defines "affected employees" as "employees who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer." 29 U.S.C. § 2101(a)(5). We have held that "employees," and therefore "affected employees," include temporarily laid-off employees who had a "reasonable expectation of recall" at the time of the employment loss. *Kildea v. Electro-Wire Prods., Inc.*, 144 F.3d 400, 405 (6th Cir. 1998); *Damron v. Rob Fork Mining Corp.*, 945 F.2d 121, 123 (6th Cir. 1991); *see also* 20 C.F.R. § 639.3(a)(1) ("Workers on temporary layoff or on leave who have a reasonable expectation of recall are counted as employees.").

The "reasonable expectation of recall" inquiry is an objective one, however. *Kildea*, 144 F.3d at 406. That is, "the question is not whether the employees in the case at hand believed they had a fairly good chance of being recalled," but rather, "whether a 'reasonable employee,' in the same or similar circumstances as the employees involved in the case at hand, would be expected to be recalled." *Id*. We consider several criteria, or factors, which are comparable to the those used by the NLRB in analyzing a similar issue:  namely, (1) the past experience of the employer; (2) the employer's future plans; (3) the circumstances of the layoff; (4) the expected length of the layoff; and (5) industry practice. *Damron*, 945 F.3d at 124; *see also Kildea*, 144 F.3d at 406.

Of these factors, it is undisputed that the first and last have no weight in this case, as there was no evidence of any past experience with layoffs at EWA or any industry practice relevant to the expectation of recall.  This distinguishes this case from *Kildea*, where we found that the employer's past experience, the industry practice, and expected length of the layoff, all established a reasonable expectation of recall.  Briefly, the employer in *Kildea*, a manufacturer of electrical wire harnesses for automobiles, lost business due to declining production needs during a downturn.  After examining the employer's past practices, we found that the employer, and the industry as a whole, had a practice of laying off employees when production levels were low and regularly recalling them when business picked up.  In fact, the employer had implemented a policy

for the retention of seniority during layoffs of up to one year.  Also significant to the decision was that management and employees both expected that the laid-off employees would be recalled.

Plaintiffs emphasize that (1) the layoffs were initially understood by all to be temporary and were made permanent when EWA decided to cease operations; (2) EWA committed to and continued to work toward resolving the issues with the FAA in order to resume flight operations; and (3) EWA's November 5 letters merely extended the layoffs rather than making them permanent.  These facts are relevant, but not determinative.  That the layoffs were temporary was necessary but not sufficient in itself to establish that the plaintiffs were "affected employees."  Otherwise, the further qualifier that the temporarily laid-off employees have a "reasonable expectation of recall" would be superfluous.  Plaintiffs' argument that there was a reasonable expectation of recall as long as EWA was working with the FAA is a variation on the view that a reasonable expectation of recall remained as long as EWA had not completely abandoned the effort and decided to close the business.  While EWA's commitment to resolve the issues with the FAA are reflected in the interim and final settlement agreements, there was also an expectation at that time that they would be successful in satisfying the FAA's conditions for resumption of flight operations.  The evidence supports the district court's conclusion that, in light of  the significant change in the dynamics between EWA and the FAA and EWA's communication with employees about the resulting unlikelihood that the issues would be resolved in a timely manner, a reasonable employee under the circumstances would not have expected to be recalled.  The district court reached that conclusion after considering the three relevant NLRB factors.

Concerning the "circumstances of the layoff," there is no dispute that EWA and the employees initially expected that the layoffs would be temporary—lasting less than six months and possibly less than 60 days—or that the layoffs were not declared to be permanent until December 2001.  Also, the layoffs were caused not by a loss of business, but by regulatory intervention.  EWA, which had been working with the FAA for many

months, expected that it could resolve the outstanding issues, return to flight operations, and recall the laid-off and furloughed employees.  The interim and final settlement agreements reflected as much.

Similarly, EWA's "future plans" and "expected length of layoff" initially would have supported a reasonable expectation of recall.  However, as the district court found, "it became progressively more apparent to the [d]efendants that the economics of complying with the heightened FAA standards did not make sense from a business perspective and began relaying its concerns about how this impacted the layoffs" to the employees.  *Bledsoe*, 2009 WL at 3127740, at *12.  The prospects for EWA changed dramatically with the imposition of the significantly greater requirements at the September 27 meeting, which EWA formally protested on October 9, and continued to seek clarification about during a meeting on November 7.  Likewise, there was an undisputed shift in the expected length of the layoffs.  EWA retreated from the optimistic statements in the August letters and stated that there were no plans to recall any employees in the October letters.  Finally, in the November 5 letters, EWA advised that it was unknown whether the layoffs would be temporary or permanent; that much greater expenditure of time and money would be required than was originally believed; and that the resumption of flight operations would not be before April 2002 and, then, only if the necessary funding could be secured and approved.

As the district court explained, "a study of the differences in tone between the letters in August, October and November 2001, indicates an increase in the expected length of the layoff period, an increasing wariness about EWA's ability to resolve the issues with the FAA, and a magnified expression of the uncertainty about whether the employees would ever be recalled, to the point where the reasonable reader (the reasonable employee) is left with no expectation of recall, by the end of the November letter." *Id*.; s*ee also NLRB v. Seawin, Inc.*, 248 F.3d 551, 558 (6th Cir. 2001) (holding that when the objective circumstances do not support a reasonable expectation of recall, equivocal statements suggesting a possibility of recall do not provide an adequate basis for finding a reasonable expectation of recall).  Given the hurdles that had developed and

the uncertainty as to whether, when, and at what cost EWA would secure the approval of the FAA to resume operations, a reasonable employee under the same circumstances would not have expected to be recalled when EWA decided to close in December 2001.

**AFFIRMED.**